# DOUGLASS *v.* THE STATE.

1. Two grounds of the motion for new trial have reference to the conduct of the jury, after the case had been submitted to them for their consideration, in visiting the grave of the deceased sheriff, for whose homicide the accused was on trial; and also the grave of a former attorney of that county who had volunteered to assist in the prosecution of the case. It is insisted that the jury held prayer over the grave of the deceased sheriff, and entered into an informal discussion over the grave of the attorney as to his public services, among which was his volunteer assistance in° the prosecution of this case. These grounds are more fully set out in the statement of the case preceding the opinion. While there are counter-affidavits, each denying in part the truth of the averments upon which these grounds are based, considering all of the affidavits pro and con, a new trial should have been granted on account of the conduct of the jury as shown in these grounds.

2. Another ground complains that after the case had been submitted and the jury were in the room provided for them, and engaged in considering their verdict, numbers of people gathered in the court-yard in sight of the jurors as they came to the windows, and one of the number of people gathered in sight of the jury tied a hangman's knot or noose in a rope, and lifted the same in view of the jurors looking out of the windows; and that this was done several times. There are counter-affidavits denying in part the facts stated in this ground of the motion; nevertheless the importance of preserving the purity of trials by jury, uninfluenced by outside demonstrations or suggestions, requires the grant of a new trial on this ground.

3. It is the duty of arresting officers, under circumstances affording reason to believe that their object and official character are unknown to persons whom they seek to arrest, to so inform the latter. Complaint is made in this case that the court failed to instruct the jury upon this principle of law. Had there been an appropriate written request duly tendered, it undoubtedly would have been the duty of the court to cover that principle of law in the charge. Inasmuch, however, as the case must be returned for a new trial, it is not necessary to decide whether the omission, without such a request, is reversible error.

4. Under the facts of the case, where there was no evidence that the accused was attempting to escape, and where the offense was a misdemeanor, not committed in the presence of the arresting officer, and where the arrest took place at night, and the sheriff, in undertaking to effect the arrest of the accused, failed to disclose his official character, and it did not appear either by direct or circumstantial evidence that the official character of the arresting officer was known to the accused, it was error requiring the grant of a new trial for the court to charge the jury as complained of in the fifth ground of the motion, which ground is set out in the statement of the case preceding the opinion and also quoted in the opinion.

5. Complaint is made that three of the jurors who served in the case were not fair and impartial, because they at the time entertained precon-

ceived and pre-expressed opinions that the defendant should be convicted. Since the case is to be returned for a new trial, and these jurors could not under any circumstances serve again, these questions need not be decided. The remaining grounds of the motion for a new trial also concern issues which cannot arise on another trial, and will not be decided.

No. 2829. DECEMBER 14, 1921.

Indictment for murder. Before Judge Wright. Walker superior court. August 26, 1921.

A. G. Catron, sheriff of Walker County, was killed on May 28, 1921; and on the trial for the homicide James Douglass was convicted of murder, without recommendation. The defendant introduced no evidence, but made a statement to the jury. The evidence adduced by the State on the trial, which was practically undenied by the statement of the accused, was in substance as follows: On the day before the homicide Catron and W. A. Wardlaw, a deputy United States marshal, were in Chattanooga, Tenn., and there met one Joe Ivans. Catron made a proposition to Ivans, which the latter, when a witness at the trial, explained to be a promise to pay a reward of $25 for each automobile containing whisky caught by means of aid from Ivans; and Ivans said this contract was confidential. Sheriff Catron and Wardlaw on the same day returned to LaFayette, the county seat of Walker County; and that night, after they had separated, the sheriff telephoned to Wardlaw that he had information that there would be a car of whisky at three o'clock on Nickajack Gap. This information came over the telephone from Ivans to Catron. Ivans testified that one Headrick came to him and asked if he wanted some whisky, to which he replied in the affirmative; that Headrick introduced him to Douglass (the accused) and Willie Burt; that he "made a contract with Douglass and Burt for 26 gallons of whisky to be delivered" to him, Ivans, at or near Headrick's house in Chattanooga Valley at 3 o'clock the following morning. Ivans did not know Douglass or Burt prior to this time. Ivans "called Mr. Catron over the 'phone and told him of the arrangements" which he had made with Douglass and Burt, at what time they would be at the designated point, and that they would be in a Ford car. Ivans testified that he gave the sheriff the details as to when and where the whisky was to be delivered to him. Ivans held no official position at this time, but testified that Catron was to give him a com-

mission as deputy sheriff the next day. Ivans resided in Chattanooga at the time these arrangements were made. Ivans also testified as follows: "I have been in trouble in Chattanooga for selling liquor. I had been in the liquor business two or three months before this homicide, and knew I was violating the law. I did not tell Catron where I lived. . . I arranged for these country boys to bring the whisky, and my aim was to trap them." After the receipt of the information from Ivans and the communication of Catron to Wardlaw a posse was summoned, including the sheriff, the deputy marshal, the sheriff of Catoosa County, and several other persons, occupying two automobiles, who went in search of the persons reported by Ivans. On arriving at or near Nickajack Gap, where Douglass and Burt were to deliver the whisky to Ivans, some one of the posse, looking ahead, saw an automobile with the top down, standing on the side of the road; but at first none of the posse saw any person in or about the car. The moon was shining and cast a shadow on the running-board of the automobile. As the posse approached, Catron said, "Boys, what have you got in this car?" or "Boys, what are you loaded with?" and two men sprang from the shadow on the running-board. One of them [Burt] ran away, and as he escaped the sheriff called out, "Don't let that fellow get away." Sheriff Catron at this moment threw his flashlight on the other man, and, as a witness testified, "they went together, I don't know which grabbed first, and the shooting commenced, just one right after the other." Other members of the posse ran with their pistols to the rescue of Sheriff Catron, and fired at Douglass as the two men had grappled. There were several shots, and the sheriff exclaimed "Oh Bill, I am shot; he has killed me." In the excitement Douglass escaped, but was afterwards arrested. After the shooting it was discovered that the Ford automobile contained twenty-six gallons of whisky. Sheriff Catron died of the pistol wounds the following night. He had no warrant, but was undertaking to make the arrest on the information conveyed to him by telephone from Ivans at Chattanooga. It is also admitted by the State that neither the sheriff nor any one in the party told Douglass and Burt that they were officers or were undertaking to arrest them or to search their car for whisky. The only words spoken to the accused were by the sheriff, as above stated. Ivans testified, that in the previous

conversation between them Douglass said " they would be there if the officers didn't stop them ;" that Burt said, " if the officers stopped him he would run," but Douglass said, " if the officers stopped him, all he wanted was to get his eye on the man that tried to stop him." This statement attributed to Douglass is denied in one ground of the motion for a new trial, based upon newly discovered evidence, where Headrick and Burt swore that Douglass did not make the statement attributed to him. In his statement during the trial Douglass admitted the killing, but denied any knowledge of the purpose and object of the posse when they approached him, and denied that he recognized Catron, and pleaded self-defense. He said, " Me and this boy were looking for a hold-up, and we thought they were a bunch of crooks who were going to take what we had. That is what I thought at the time." Douglass also insisted that it was his first trip " to fool with whisky ever in the world ;" that he had nothing at home for his family to eat, and that this caused him to enter into the arrangement with Ivans. He also stated that when they got to the point where they were to meet Headrick and Ivans they sat down on the side of the automobile for about ten minutes, rolled and smoked cigarettes, and had just thrown the cigarettes down when they were approached by the posse.

After sentence the defendant filed a motion for a new trial on the general grounds, which motion was subsequently amended by adding grounds as follows:

(1) That J. W. Mahan, who served as one of the jurors in the case, was not a fair and impartial juror, having expressed an opinion, before qualifying as a juror, that the defendant should be burned or have his neck broken. (2, 3) The qualification of J. R. Chamblee and of Guy Welch as jurors is attacked upon the same ground, it being alleged that before qualifying each of them expressed the opinion that the defendant ought to be hanged.

(4) That the jury were unduly influenced against the defendant, in that after they had retired to consider their verdict they were allowed to go, more than once, without the knowledge of the defendant or his attorney, to the cemetery and to gather around the grave of the deceased sheriff; and that jurors favoring unqualified conviction sought to control other jurors by calling on all jurors to join in prayer.

(5) That the court erred in charging the jury as follows: "However, I charge you that if the officer, Mr. Catron, the deceased, knew that the defendant was about to make an escape, he would have a right to make an arrest to prevent such an escape, or the defendant was committing a crime, of which the officers knew at the time, in the presence of the officer, then the officer would be authorized to make an arrest for such crime; and if he was so authorized, it would have been the duty of the defendant to have submitted to the arrest, and, if he did not submit, then the officer would have been authorized to have used such force as was necessary to perfect the arrest, even to the extent of taking the life of the defendant; and if the defendant took the life of the officer, the deceased, at the time the deceased was attempting so to make the arrest legally, and the defendant knew at the time he was an officer so attempting a legal arrest, the defendant might be guilty of the offense of murder as charged. What the truth about all this is you are to determine from the evidence you have heard from the stand." Movant insists that this charge was error, (a) in that the court instructed the jury that an officer would be authorized to use such force as was necessary, "even to the extent of taking the life of the defendant," where the latter was suspected of committing a misdemeanor; (b) in that the court instructed the jury that "an officer without a warrant had a right to make an arrest if the defendant was attempting to escape," and, if necessary to prevent the escape, to kill the defendant. The objection to this charge is that there was no evidence of any attempt to arrest the defendant, and that there was no evidence that the defendant made any attempt to escape before the officer was killed; (c) in that the court instructed the jury that it was the duty of the defendant to submit to arrest, without more fully adjusting the charge to the facts of the case; movant insisting "that the defendant was approached in the darkness of night after midnight, on a lonely road, in a country which was strange to the defendant, by five men, all of whom were armed; but that there was no evidence whatever showing that the defendant knew that any of these persons were officers, or knew that any arrest was intended;" that the officers had no warrant and did not make known their identity as officers.

(6) Movant contends that the court did not instruct the jury

on the main contention of his defense, to wit, that it was the duty of officers in making arrests, under the circumstances of the case, to inform the defendant that the parties approaching him were officers, and that the purpose of the officer was to make an arrest; and that this failure to so instruct the jury was error.

(7) Because, after the case had been submitted and the jury had retired to consider their verdict and were being confined in a room with windows looking out on the public court-yard, " that numbers of people gathered on said court yard, in sight of the jurors as they came to the windows. Movant shows that while the jury was in the jury-room and while some of the jurors were leaning out of the windows, looking down at the crowd in the public court-yard, a number of men gathered at one place in said yard when Sam Burgess, one of the men at said gathering, produced a rope in the sight of the jurors looking out of the windows, and proceeded to tie a running knot or noose in the rope, said knot or noose being known as the hangman's knot; that the said Sam Burgess then lifted said hangman's knot and shook it and drew it in view of jurors looking out of the window. Movant attaches the affidavits of Tom Gravitt, J. A. Carman, and W. L. Hampton, who on oath say that they and each of them saw the said Sam Burgess lift and shake and draw said hangman's knot in the plain sight of said jurors looking out of the window; that this was done by the said Sam Burgess several times."

(8) Because of evidence newly discovered, to the effect that Douglass, the defendant, did not make the statement as testified to by Joe Ivans, to the effect that Douglass stated to him on the day before, in Chattanooga, " that he just wanted to catch the eye of any officer interfering with him."

(9) Because Guy Welch, one of the jurors in the case, was not drawn and summoned as a juror for said term of the court; his name was not on the list of the jury as called, or as sworn on their voir dire, or on the list from which the jury was stricken, but he was substituted for Guy West, whose name was so called and appeared on the jury list, and who was selected as one of the jury to try the case. Defendant and his attorneys were unacquainted with Guy West and Guy Welch; and the substitution of Guy Welch for Guy West was unknown to them until after the trial and the rendition of the verdict.

(10) Because the jury, after the charge of the court, and while they were considering their verdict, were unduly influenced by being allowed to go to the grave of J. P. Shattuck, who had recently died and who was one of the original counsel, and who, as was well known to the jury, had volunteered to assist in the prosecution of the defendant, and whose law firm was employed to actively assist and participate in the prosecution, and the surviving member of said firm, Norman Shattuck, did actively participate in said prosecution throughout the trial; and while at the grave of J. P. Shattuck, and only a few minutes after they had visted the grave of Mr. Catron, and while they were still considering the verdict, the jury stopped at the grave of J. P. Shattuck, and " discussed his life and things connected therewith, and his value to the community, which matters included his interest in this case, and by said gathering and discussion at said grave, particularly in connection with their gathering only a moment before at the grave of Mr. Catron, the sympathies and emotions of the jury were aroused and wrought up, and its verdict was unduly and improperly influenced against defendant."

*O. N. Chambers* and *W. H. Ennis,* for plaintiff in error.

*George M. Napier, attorney-general, Eugene S. Taylor, solicitor-general, Seward M. Smith, asst. atty.-gen., Norman Shattuck,* and *Rosser & Shaw,* contra.

GILBERT, J. 1, 2. The first and second headnotes, relating to the fourth, seventh, and tenth grounds of the amended motion for a new trial, may appropriately be discussed together. In these grounds complaint is made of the conduct of the jury, after the case had been submitted to them for consideration, in visiting the grave of the deceased sheriff, for whose homicide the accused was on trial, and also the grave of a former attorney of that county, who had volunteered to assist in the prosecution of the case. These grounds are more elaborately set out in the statement of the case preceding this opinion. It will suffice to say here that the ground of the motion based upon the misconduct of the jury in visiting the cemetery is supported by an affidavit of one of the jurors, to the consideration of which there was no objection, which, omitting the formal parts, is as follows: " I was a member of the jury which tried the case of The State *v.* James Douglass, on July 7, 1921, and which rendered a verdict of guilty, July 9, 1921. At

the end of the day of the trial, the jury seemed hopelessly divided, and the next day the jury requested a recharge on the law of murder, which was given about 10:20 the second day. At the end of the second day the jury reported to Judge Wright that it was still unable to reach a verdict, and seemed hopelessly disagreed. After this they went to the cemetery where sheriff Catron was buried. On the morning of the third day, July 9th, the jury again went to the cemetery where the slain sheriff was buried. After being out about forty hours the jury seemed to be still hopelessly disagreed, but they went to the grave of the sheriff with perfectly good motives, and had no idea of doing anything improper. As they had been unable to make a verdict after 40 hours deliberations, a number of the jurors prayed over the sheriff's grave fervently, that they might receive spiritual guidance and direction in reaching an agreement and making their verdict. This was followed by an agreement of all the jurors to return a verdict of guilty, without recommendation, and the jury so reported within a few minutes thereafter." There was also an affidavit by a deputy sheriff who was in charge of the jury, in which he swore that the jury did visit the cemetery " in a body, walked around through the cemetery, stopped at several graves, particularly at the grave of J. P. Shattuck, but recently died [he being the deceased attorney mentioned in the motion], the jurors discussing the value of Mr. Shattuck as a man to the community, and also his financial worth; incidentally some one of the jurors inquired where Mr. Catron was buried, and juror Sam Smith stated that he knew where he was buried, and would show the jurors; that the jury went to the grave of Mr. Catron, and there was not at any time any prayer or invoking of divine guidance while at the grave of Mr. Catron, neither did deponent hear any suggestion from any source that they should engage in prayer at said grave, and there was no audible prayer of any sort uttered at the grave, nor any suggestions thereof." The juror who made the above-quoted affidavit, retracted, in a subsequent affidavit, all of that portion thereof which stated that the jurors held prayer at the grave of Mr. Catron, and further swore that no comment was made at the grave touching the verdict to be rendered in the case; neither was the visit to said grave in any way referred to in the consideration of the verdict to be returned in the case. This juror swore that in signing his original affidavit

he did not understand that the affidavit stated, and that he did not intend to state, that the jurors held prayer at the grave of Mr. Catron. The juror did not deny all that was contained in his original affidavit; therefore the facts remain, that at the end of the day of the trial the jury seemed hopelessly divided, that they had requested a recharge on the law of murder, which was given on the second day, that at the end of the second day the jury reported to the judge that it was still unable to reach a verdict and seemed hopelessly disagreed, that after this they went to the cemetery where Mr. Catron was buried, that on the morning of the third day they again went to the cemetery "where the slain sheriff was buried," that after being out about forty hours the jury still seemed to be hopelessly disagreed, "but they went to the grave of the sheriff with perfectly good motives and had no idea of doing anything improper." Whether there were prayers at the grave or not, a verdict of guilty was agreed upon after a long delay and after the visits of the jury to the graves. Under these circumstances, especially when viewed in connection with the general setting that surrounded the case, as shown by the entire record, it is scarcely probable that the jury were not influenced by their visits to the cemetery. They may be, and doubtless are, perfectly honest and sincere in the belief that they were not influenced. The sanctity and purity of jury trials necessarily depend upon the absolute freedom of the jury from outside influences. It is well-nigh impossible to eradicate such influences as these from the minds of jurors. We are forced to this conclusion by the competent evidence contained in the affidavit of the deputy sheriff, even if we totally disregard the affidavit of the juror tending to impeach his verdict, which we would have been bound to hold incompetent if the same had been objected to, and which the trial judge would have been authorized to disregard even though it was not objected to by the State's counsel.

The seventh ground of the amended motion complains that after the case had been submitted and the jury were in the room provided for them and engaged in considering their verdict, numbers of people gathered in the court-yard in sight of the jurors as they came to the windows, and one of the number at said gathering produced a rope in the sight of the jurors looking out of the windows, and proceeded to tie a " hangman's knot or noose " in the

rope, and lifted the same and shook it and drew it in view of the jurors looking out of the window, and that this was done several times. These facts were sworn to by three witnesses, all of whom are supported by affidavits as to their good character. On the hearing of the motion for a new trial the State submitted counter-affidavits denying in part the facts alleged in this ground of the motion. One of these affidavits was that of Sam Burgess, alleged by the accused to have been the person who tied the hangman's knot. The material portion of the affidavit of Burgess was as follows: "It is wholly untrue that on the 8th day of July, 1921, while the jury was considering their verdict in the above-stated case, that he produced a rope, tied said rope into a running noose or hangman's knot, and [did] lift said running noose into the view of said jurors in the window and shake said running noose and pull said running noose or hangman's knot; and it is wholly untrue that he said, ' We will show the jury what we want done with this man.' Deponent says that on the 8th day of July, 1921, with others, he was standing in the street just a few feet east of the Shearer furniture store; that at the time the jury considering the above-entitled cause was confined in a jury-room on the second floor of the court-house, across the street from deponent, which said room has a window opening on the street in which deponent was standing, but deponent was approximately one hundred and fifty feet from this window; that there was a two-horse wagon standing in the street between deponent and the court-house; that deponent and others were discussing the case the jury were considering, and speculating on the probable verdict. Deponent, during the course of the conversation, walked over to the wagon standing in the street, picked up a leather whip lying in the wagon, and asked some one if he could tie a hangman's knot; that some one in the crowd then took the whip and tied some sort of knot, but deponent does not know that this was a hangman's knot. This whip was not held up by deponent in the sight of the jurors or otherwise, and deponent made no remark about showing the jury what we want done with this man, or similar remark. Deponent further says that the whip could not possibly have been seen by the jury, on account of the wagon standing between deponent and the jury-room, and deponent made no remark of any sort which could have been heard by the jury. Deponent further

says that at the time he stepped towards the wagon to get the whip he noticed that some of the jurors had their backs towards the window, and that none of them were looking out of the window or paying any attention to anything on the street." Affidavits of the jurors were also submitted by the State, the substance of which were denials on the part of the jury that they saw any person exhibit to them any rope in which a hangman's noose or similar noose had been tied, and did not hear any person make any statement showing the jury what they should do with the accused. Out of the affidavits pro and con, on this subject, the one indisputable fact is disclosed, that some one, standing about 150 feet from the window of the room in the court-house where the jury considering the case were confined, tied a " hangman's noose " or similar knot in a rope or whip; that some of the jurors were standing at the window with their backs to the court-house yard; and that ten only of the jurors swore that they did not see the tying of the knot and did not hear anything said by those connected with the episode. As shown above, the jury were long divided upon the question of what verdict they should return; they had visited the grave of the " slain sheriff," had visited the grave of the deceased attorney who had volunteered to prosecute the case against the accused, had discussed the public services of this attorney and the value of his life to the community. The slightest demonstration within the view and comprehension of the jury may have been sufficient to turn the delicate scale of justice, so evenly balanced as it seems to have been during the deliberations of the jury. " The object of all legal investigation is the discovery of truth," and under our law the only source from which the jury is permitted to gather the facts for the discovery of truth is from the trial itself. Influences such as those referred to in the grounds of the motion for a new trial now under discussion may be so slight and so subtle that the jurors themselves may be wholly unaware of them; but where the integrity of jury trials is at stake, verdicts resting under such a cloud must be set aside. We think it follows from what has been said above that the court erred in not granting a new trial.

3, 4. Complaint is made that the court instructed the jury as follows: " However, I charge you if the officer, Mr. Catron, the deceased, knew that the defendant was about to make an escape,

he would have a right to make an arrest to prevent such an escape, or the defendant was committing a crime, of which the officer knew at the time, in the presence of the officer, then the officer would be authorized to make an arrest for such crime; and if he was so authorized, it would have been the duty of the defendant to have submitted to the arrest, and if he did not submit, then the officer would have been authorized to use such force as was necessary to perfect this arrest, even to the extent of taking the life of the defendant; and if the defendant took the life of the officer, the deceased, at the time the deceased was attempting so to make the arrest legally, if he did attempt legally so to make the arrest, and the defendant knew at the time he was an officer so attempting a legal arrest, the defendant might be guilty of the offense of murder as charged. What the truth about all this is you are to determine from the evidence you have heard from the stand." The charge was an instruction on the law of arrest without a warrant, when the accused was attempting to escape, or the crime was committed in the presence of the officer, etc. Was this error requiring the grant of a new trial? Under all of the facts of this case we think it was. The evidence adduced on the trial as to how the killing occurred and the facts and circumstances which preceded it are, for all practical purposes, without conflict. The facts in this case demonstrate that the sheriff entertained an erroneous idea as to his right to make an arrest for a misdemeanor without a warrant and without disclosing his official character. It should be obvious to all fair-minded and law-abiding citizens that it is equally as important for arresting officers to confine themselves within their legal rights in making arrests as it is the duty of the citizen to peacefully submit when a legal arrest is made or sought to be made. The binding force of the law must rest upon all alike, the good and the bad, the public official and the private citizen. For the arrest of one charged with a misdemeanor our Penal Code, § 917, declares when, and when only, an officer may make an arrest without a warrant, to wit: "An arrest may be made for a crime by an officer, either under a warrant, or without a warrant if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." If the offense is a felony, greater latitude is allowed; but this

question need not be considered in the present case. We will un-
dertake to examine carefully the statute just quoted, as applied to
the facts of the case. The arrest was sought to be made by an
officer, and on the trial of the cause the legality of that arrest was
properly made an issue under the statute in question. Admittedly,
the officer was without a warrant. First: Was the offense com-
mitted in his presence? Under authority of the case of *Pickett*
v. *State,* 99 *Ga.* 12 (25 S. E. 608, 59 Am. St. R. 226), this ques-
tion must be answered in the negative. There it was held that
" an arresting officer has no authority, without a warrant, upon
mere information that another is carrying a concealed pistol, to
arrest the latter and search his person for the purpose of ascer-
taining whether or not he is in fact violating the law prohibiting
carrying concealed weapons. Even if he was so doing, the offense
was not, in legal contemplation, committed in the presence of the
officer, and such an arrest and search are unauthorized by law, and
are, within the meaning of the constitution, unreasonable." There
the offense for which the arrest was undertaken, as in this case,
was a misdemeanor. In the opinion Mr. Justice Lumpkin said:
" ' The right of the people to be secure in their persons, houses,
papers and effects, against unreasonable searches and seizures,
shall not be violated.' Code, § 5008 [Code of 1910, § 6372].
If any search is unreasonable and obnoxious to our fundamental
law, it is one of the kind with which we are now dealing. Even
if the person did in fact have a pistol concealed about his person,
the fact not being discoverable without a search, the offense of
thus carrying it was not, in legal contemplation, committed in
the presence of the officer, and the latter violated a sacred con-
stitutional right of the citizen in assuming to exercise a pretended
authority to search his person in order to expose his suspected
criminality." Second: Was the offender endeavoring to escape?
As has already been stated, there is no evidence tending to show
that the offender made any effort to escape until after the fatal
shooting had occurred. On the contrary, unfortunately, he stood
his ground, and the most unfortunate tragedy took place. Com-
pare the case of *Giddens* v. *State,* 152 *Ga.* 195 (108 S. E. 788).
Was there, for other cause, likely to be a failure of justice for the
want of an officer to issue a warrant? This unquestionably must
be answered in the negative, since the undisputed facts show that

the sheriff's agent in Chattanooga gave him the information about six o'clock in the evening, while the sheriff was at the county seat. It is not even suggested that an officer to issue a warrant was not available.   While the court charged the jury correctly on other principles of law involved, including the law of self-defense, based upon the contention that the defendant killed the deceased in the honest belief that he was about to be robbed, we are of the opinion that the instruction in regard to the right to make an arrest without a warrant was unauthorized under the facts of the case, and that a new trial should be granted.   Perhaps it will serve a useful purpose to iterate here a caution to arresting officers that it is their duty, under circumstances such as shown by the record in this case, to disclose their official character to persons whom they seek to arrest; to provide themselves with warrants in furtherance of justice, of which they are chosen ministers.   In the case of *Davis* v. *State,* 79 *Ga.* 767, 769 (4 S. E. 318), where the prosecution was for a felony and the question of the legality of an arrest was in issue, the court said: " If Tompkins [the deceased] was an officer of the law, he should have informed the defendant of the fact, and of the additional fact that he had a warrant for his arrest. ' The officer must at the time be engaged in executing his duties, and the defendant must be notified thereof; and unless there be notification or knowledge to this effect, the killing of the officer will not be murder.  .  .    There was no notice given the defendant by Tompkins that he was an officer, or that he had a warrant for his arrest.' "   Compare *Croom* v. *State,* 85 *Ga.* 718 (11 S. E. 1035, 21 Am. St. R. 179); *Snelling* v. *State,* 87 *Ga.* 50 (13 S. E. 154); *Thomas* v. *State,* 91 *Ga.* 204 (18 S. E. 305); *McCray* v. *State,* 134 *Ga.* at p. 427 (68 S. E. 62, 20 Ann. Cas. 101); *Graham* v. *State,* 143 *Ga.* at p. 445 (85 S. E. 328, Ann. Cas. 1917A, 595); *McCrackin* v. *State,* 150 *Ga.* 718 (105 S. E. 487).   The lawfulness of the arrest, or the contrary, is an extremely important matter in a case of this character, as it may determine whether the homicide is murder, voluntary manslaughter, or justifiable homicide.

*Judgment reversed.   All the Justices concur.*