26754. NEWKIRK *v.* THE STATE.

DECIDED APRIL 14, 1938.

*James H. Pate,* for plaintiff in error.
*W. C. Forehand, solicitor-general, J. B. Williamson,* contra.

GUERRY, J. The defendant was indicted and convicted of the offense of "shooting at another." The evidence for the State shows that the defendant's father was having a dispute in respect to the possession of certain farm lands. The defendant and his brothers

were working on this farm for their father. On the day of the alleged shooting he (the defendant) and his two brothers had driven to a field on the disputed premises to do a day's plowing, and had carried with them two shotguns and a Winchester rifle. They went to a near-by well to get a drink of water and carried their guns with them, and had started back to work when the sheriff of the county and his deputy rode up in his car, followed by one of the claimants to the land (George Young) in a truck. Warrants had been legally sworn out against the defendant and his brothers charging them with a misdemeanor and placed in the hands of the sheriff and his deputy to be served, and were in their possession at this time. When the sheriff and his deputy were within about eighty yards of the defendant he and his brothers were squatting down in a "crouched position with their guns in their laps." The sheriff testified: "I just walked out to the edge of the road and called to them, I said: 'Boys, we have warrants for you fellows here—come on let's go to town.' They spoke up, all three of them commenced talking, and they said, 'No, we are not going with you.' I said, 'Oh, yes, you are. What's the matter with you boys? I have warrants for you; I am an officer out here with warrants to serve for [on?] you; all of them are misdemeanor warrants, and you can go on in to town, give bond, and come on back. Come on let's go to town.' They said, 'No, we are not going.' I said, 'Oh, yes, you are, what's the matter with you boys?' I said 'You haven't anything much against you now, but you are going to have something against you when you go to resisting an officer.' They were then standing up with their guns in a ready position . . the guns were pointing out in the direction that we are [were?] in—they were not pointing directly at us then, but they were standing there with their guns, just like this, at that time. The guns were held across their bodies—in front of them, with the butts of the guns at the elbow and the muzzles elevated in front of them, and they said, 'No, we are not going with you. We know what you come out here for; you come out here to put us off the land and we are not going.' I said, 'No, I didn't come out here for any such purpose as putting you off the land— I don't know anything about the land trouble, if you have got any trouble, and I care nothing about it. I come out here in the discharge of my duties, as an officer, to make this arrest.' They said,

'No, we are not going with you.' Then they began to get more boisterous and told me to get off the place. One of them said: 'Mr. Sumner, we are not going with you, and you get off this place.' These defendants were known to me and I was known to them. I have known them all their lives. They have known me for years—all their lives." The sheriff further testified, after having detailed his acquaintance with the defendants, as follows: "About the time they had said all this, and this much had happened, we then advanced out a little ways in the road—what I was undertaking to do, after I saw their attitude, was to try and handle them without any trouble, to us or to them, but, after I was convinced I couldn't, then Mr. Bruce and myself started walking toward them, we had our service pistols, mine was in the scabbard, his was in his scabbard, and I had mine right on this side, in the scabbard, and Mr. Bruce had his on about the same place on him, right about here. We had not drawn them at that time. I had not put my hand about my pistol, I had my hands by my side—I made up my mind I would not put my hands about the pistol because I wanted to let them know I was trying to handle it in the best way I knew how. I looked at Mr. Bruce and he had his hands down that way. We commenced walking towards them and talking to them. I had an idea they were bluffing, and we could go walking up to them, without putting our hands about the pistols—get to them and talk to them and get the guns away from them—that was the idea I had in mind. As we walked toward them, they come up with their guns and hollered, 'Stop! Stop! Don't come no closer, don't you come no closer!' and finally they just hollered, 'Don't you come a step closer.'" The officers then turned back to the road where they left their car and went up to the house where the truck was stopped, and just before doing so the defendants again told them that they were not going with them and to get off the place. At the truck the officers got two shotguns and five shells loaded with buckshot, three for the sheriff and two for the deputy, and then walked back to the defendants who were still standing with their guns held in a threatening position. A large chinaberry tree with two or more prongs stood between them, and the sheriff ordered the deputy to get behind this tree. The sheriff again remonstrated with the boys, and endeavored to get them to come on with him peaceably, and they again demanded that he stop his ad-

vance and pointed their weapons at him. He had walked about twenty feet towards them when they told him not to come a step farther and pointed their guns at him. The sheriff walked back to the tree and told his deputy not to get exposed more than he could help, and then commanded the boys to drop their guns, and, "When I come up they come up, and I shot and they shot, the shooting all started, almost at the same time. Talking about Mr. Bruce shooting—I know he shot but I don't [know?] when he shot—the bark begin to fall off the tree—bullets were whizzing by, and the shooting lasted then until I cocked the other barrel of the gun, and come out on the side of the tree, and shot again—all that time the shots rained in there from them, some of them hit the tree."

The defendant took part in the shooting. Several bullets were afterwards found in the tree and one place where a rifle bullet had passed through. The officers fired four times and some eighteen or twenty shots were fired. The deputy and another eyewitness corroborated the testimony of the sheriff. After the shooting was over, several empty shells and cartridges were found where the defendant and his brothers had been standing while the shooting was in progress. One of the brothers was struck in the buttock by buckshot. The defendant and his brothers left the scene without being arrested. The defendant, in his statement, after detailing the dispute over the land which occurred prior to the time of the shooting, stated: "Mr. George Young was on the north side of us; we saw him, running, and he come up to the truck and he grabbed up the guns, and he tuck the shotgun off the truck and told us to drop it; and the old man, he tuck the gun away from him and he told him to give him the gun; then he come back to the tree and we dropped our guns to our sides, and he throwed up his gun and shot, and we wheeled to run and he shot and the bullet hit Lester, then he wheeled and shot, and I wheeled and shot, and John, he wheeled and shot, and then we made it home." He also denied that he knew that it was the sheriff. There was no other evidence.

The court refused to give in charge to the jury a written request, in substance as follows: "An arresting officer, in attempting to make an arrest of a defendant against whom he holds a warrant, . . in which defendant is charged with offenses graded as misdemeanors, may not employ force to the extent of using a deadly

weapon, or of shooting at the person charged, for the mere purpose of accomplishing or effecting the attempted arrest, and may do so only in self-defense under the rules of the law as to self-defense; and this is the true rule to be applied in this case, whether (a) it appears that it was the purpose of [or?] intention of the officer, in shooting at the person, or persons, charged to kill such person, or persons, or (b) to stop the flight of such person, or persons, and prevent an escape, or (c) to accomplish or effect the yielding or submission to arrest."

"It is the duty of every person arrested under legal process to quietly submit; and if the offense is committed in the presence of the arresting officer, the rule is the same, and in case the offender refuses to submit, the officer has the right to use such force as is necessary to accomplish the arrest." *Dixon* v. *State,* 12 *Ga. App.* 17 (6) (76 S. E. 794) ; *Ramsey* v. *State,* 92 *Ga.* 53 (5) (17 S. E. 613). In *Moody* v. *State,* 120 *Ga.* 868 (4) (48 S. E. 340) it was held: "It was not error to charge, 'If you find from the evidence that the prosecutor resisted or assaulted the arresting officer, look to the evidence and see whether or not the force used by the officer was in proportion to the resistance used. If so, you should acquit the defendant. But if you should find from the evidence that the assault was greater than was necessary to be used in making the arrest and holding the prisoner, it would be your duty to return a verdict of guilty against the defendant.'" The attempted arrest by the officers in the present case was a legal and not an illegal arrest. The evidence amply authorized a finding that the defendant knew the capacity in which the officers were acting. The evidence for the State shows that an unusual amount of caution and restraint was exercised by the officers before the attempt to use force. Code, § 27-206, declares: "Every officer is bound to execute the penal warrants placed in his hands." "The common-law offense of refusal by an officer to execute a warrant delivered to him for that purpose is indictable in this State." *Ormond* v. *Ball,* 120 *Ga.* 916 (13) (48 S. E. 383). An officer may not, in the execution of a legal criminal warrant, where the charge is a misdemeanor, proceed to the extremity of shedding blood or killing, where the accused is attempting to avoid arrest by flight, even though the offender can not be taken otherwise. *Holmes* v. *State,* 5 *Ga. App.* 166 (3) (62 S. E. 716).

Even with a warrant an officer can not legally kill one who flees him to avoid arrest for a misdemeanor. On the other hand, where the law places a duty on an officer to serve a penal warrant and makes him indictable for neglect to serve it, even though for a misdemeanor offense, the accused may not arm himself with deadly weapons and, in company with others of a similar disposition, defy such officer, and by threats and a show of force prevent such arrest, and then claim protection because the offense charged is a misdemeanor, where the officer uses only such force as is necessary to overcome the resistance offered. "Resistance to an arrest may begin by the use of words which import defiance and indicate a purpose to use violence if necessary." *Ramsey* v. *State*, 92 *Ga*. 53 (supra). This is especially true where such words are accompanied by pointing of loaded guns. The law will not tolerate open and armed defiance of its representatives even though in the execution of a misdemeanor warrant. It is one thing to shed blood to stop an attempted flight; it is another to overcome open, armed, and inexcusable defiance of the ministers of the law in the execution of its mandates. In 6 C. J. S. 614, it is said: "Although recognizing the rule that an officer may not kill a misdemeanant, who is simply fleeing to avoid or escape an arrest, it has also been held that the officer may use force even to the extent of killing accused where he makes resistance, and the officer is not bound to defer the arrest until a more favorable time." People *v.* Hardwick, 204 Cal. 582 (269 Pac. 427) ; Holloway *v.* Moser, 193 N. C. 185 (136 S. E. 375) ; Krueger *v.* State, 171 Wis. 566 (177 N. W. 917). The trial judge in his charge used this language which we think was especially applicable: "If you find the officer was attempting to effectuate a legal arrest, he would have the right to use only such force as was reasonably necessary to effectuate that arrest. He would not have the right to use force not reasonably necessary nor would he have the right to use force in excess of what was reasonably necessary to effectuate the arrest, or if no force at all was necessary to effectuate the arrest he would not be authorized to use any force." The charge requested restricted the right of an officer to use such force as was necessary to overcome armed, open, and defiant threats, and refusal to submit to arrest. Even though the offense charged is a misdemeanor, the arresting officer acting under a legal warrant may use such force as is necessary to effectuate such

result. There were other requests to charge but they were not adapted to the principles here enunciated and the court did not err in refusing to give them in charge. The evidence amply supports, if it does not demand, the verdict rendered.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*