Rulings on the law of arrests by officers; publication of verdict, after polling of jury, in absence of counsel for accused; and contentions raised by exceptions to charge to jury on trial for murder. New trial after conviction was properly refused.
 No. 13287. SEPTEMBER 25, 1940.
LeRoy Morton was convicted, without a recommendation, of the murder with a pistol of Louis D. Hubbard, a deputy sheriff, who *Page 793 
at the time of the homicide was engaged in raiding an alleged still of the defendant. The evidence shows that on a night in October the defendant and three other negroes were engaged in operating the still on a branch, with wooded, swampy surroundings and steep hills at the sides. The still had been run at intervals for about two months. Hubbard (the deceased) and Parrish, deputy sheriffs, and McNair, a constable and town marshal, who had seen the still two or three times, concealed themselves around it; the defendant and his companions came to the still and worked in and around it, using flashlights. The two deputies approached down the branch to within twelve or fifteen steps of the still, but could not get through the thick underbrush thrown in the branch. As they were backing out, two of the persons at the still approached, each with a flashlight. According to the evidence of Parrish, one of them threw his light on the officers, and said, "Here is a man; must I shoot?" saying this twice, and another person at the still said, "Shoot." Parrish then fired at the flashlight. A companion of the defendant testified that it was the defendant who held the flashlight on the deputies and said he saw a man, and that all of the defendant's companions at the still immediately ran "because he said he saw a man." Parrish further testified that after he fired "at the flashlight" the "light went out," and the one holding it turned and began to run. "I shot twice more. Hubbard [the deceased] takes out after the negro that I shot at; . . the negro ran . . up the hill. Mr. Hubbard was behind him. . . Where Mr. Hubbard's body was found . . it was 123 steps going down the hill and 133 steps going up the hill [to the still] — so there was a right smart hill there. . . There was no notice by any word from me or Mr. Hubbard that an arrest was about to be made; none at all. We were trying to slip up on them, doing our best not to make any fuss. There was nothing said by me or Mr. Hubbard so that the people at the still knew . . that it was an officer of the law. . . I did not hear Mr. McNair's [the constable's] gun barking away. I never did hear his gun fire down there at the still. I would think it was two or three minutes after the firing had ceased at the still before I met [him] up on the hill the first time. When I met [him] . . the shooting over by the ditch had already taken place. . . I saw [the deceased's] flashlight turned; [he] had gone up on the hill, and was turned and *Page 794 
coming across the hillside toward Reedy creek; and in a few seconds or half a minute, I heard four, three or four or five gunshots, me thinking it was [the deceased] doing the shooting. . . It sounded like a pistol, four or five rapid pistol fires." Soon afterwards the witness and the constable found the body of the deputy, as the witness said, lying by a gully, the flashlight burning "about at the end of his fingers . . of his right hand, and his pistol was along about his belt . . out of the holster. It was lying under his body. . . It was full with the exception of one empty hull under the hammer."
Parrish and another witness testified that it was the deceased's "custom to carry one empty shell under the hammer of the gun." When the defendant was arrested later, it was found that he had been hit twice by bullets, which were fired at the still location, one striking his right arm, traveling up his arm, and the other grazing his right shoulder from the back. The deceased had been shot in the head with a 32-caliber pistol bullet, which produced instant death, and another bullet had penetrated his leather pistol holster. The deceased deputy and McNair, the constable, had carried 38-caliber pistols. While Parrish carried a 32-caliber pistol, there was expert testimony that the fatal bullet could not have come from his weapon, in addition to his testimony that when he fired, the deceased was behind him, a considerable distance from where the defendant and the deceased ran, and where the body was found. Will Oatman, the defendant's companion, who testified as to the defendant's flashing his light on the deputies, also testified: "LeRoy [the defendant] had a still. Each time I would go with them and help operate the still. . . We come down from Augusta to the still that Saturday evening about two o'clock in the daytime. LeRoy came with me down there. When we first came there we went to Nath's [uncle of the witness] house. . . Nath did tell us something about the still; he said he heard they had found it. . . When we operated it before, we operated it in the daytime most of the time. We had to be in a hurry to get through with it. We thought the quicker we got through with it the better it would be for us. The reason of that was you want to get there and get through with it as quick as you can in a place like that; somebody is liable to come in on you any time. We come down and found the mash ready to run. We just spoke to Nath, and he *Page 795 
told us he heard they had found it, and we wanted to run it off quick before the law got there that night; if they was coming in there, we wanted to get through. . . We went by LeRoy's house. When he come out from his house, he wrapped up something in a paper. He had a gun in the paper; it was a pistol. It was a long shiny pistol." He further testified that no one at the still had a gun except the defendant. In a written statement, the defendant said that his pistol was a 32. Brinson Sweat, another companion of the defendant at the time of the homicide, testified: After a run of the still, the defendant "went off on the left side of the creek and flashed his light, and said . . `Here a man, I'm going to shoot him,' and he said, Oatman said, `Shoot,' and then he broke to run. Oatman, Bill Oatman, but LeRoy Morton — he was on the left-hand side of the way I was going when he said he was going to shoot, and Bill Oatman was on the right-hand side, he says, `Shoot' then. Then I heard a pistol fire; that pistol fired and stopped, and then looked like four or five shots was made after that, one right after the other. . . I am certain that LeRoy did say, `Here is a man; must I shoot?' Bill Oatman said, `Shoot."'
Essential parts of the defendant's statement to the jury are as follows: "I have never been in trouble before. . . Work give out in August, and me and Bill Oatman . . started to making liquor; and this Saturday when the still got tore up, that Saturday evening me and Bill Oatman left the city and come down and stopped there at Nath Oatman's house, and he said we had better not go down there, because the people had been down there and tore up everything down there, and there wasn't anything down there. . . We got down there, and everything was there just like we left it; so we thought he was joking, . . and we asked Tom Walker what did he know about tearing up the liquor still, and he said he didn't know anything; and then we knowed Nath Oatman was joking then, because he had been trying to keep us from going down there. . . We got back down there that night, and I stopped the car at Tom Walker's house, and went on down in the swamp. So later on that night I heard some fuss in the bushes, I thought it was a possum. . . I got my flashlight and I went up there and looked. I saw a man lying flat on the ground, about my age. I said, `There is a man down there,' he said, `I will shoot *Page 796 
you, I will shoot you,' and I says, `Don't shoot me, don't shoot me, please don't shoot me,' and he shot me in the arm, and I turned and ran, and he ran behind me, and I ran into a tree and knocked myself kind of crazy and fell down, and I says, `Don't shoot me; I ain't going to run any more,' and he shot me in the shoulder, and I jumped and run. I didn't know the man, or he never did say nothing. He run behind me, his flashlight blinded me. I run in a gully and fell down. I got out of that gully, and I run in another gully; before I could get out of that gully he was shooting at me, and I says, `Don't kill me, don't kill me, please don't kill me, don't kill me.' Then I grabbed up my pistol and I shot twice, and I run on up the hill. I don't know whether I had hit him or not, because I didn't shoot at him, I just shot that time to make him stop shooting at me, . . and I was sorry I ever had shot, but I just shot that shot to stop him from shooting me."
The defendant excepts to the refusal of a new trial on the general grounds and eleven special grounds, the facts as to some of which are not approved by the court. Exceptions to instructions and to refusal of requests to charge, together with such charges and requests, in so far as they are not sufficiently indicated in the syllabus, are as follows: Exceptions are taken to the refusal to charge the law of voluntary manslaughter in the exact language of the Code, § 26-1007, and to the instructions given on that subject, as erroneous and unadapted to the evidence and the defendant's statement and contentions, such charge being as follows: "Voluntary manslaughter is an unlawful killing, but without malice. It is the middle ground between murder and justifiable homicide. Murder is where one inflicts a mortal wound and takes the life of a fellow creature with a deadly weapon, with malice, as I have just explained — malice aforethought. Justifiable homicide is where an assault is made that justifies the killing; and I will come to the law of justification in a little while. But this grade of homicide, manslaughter, is written into the law in recognition of human frailty and human passions. Why? The law says that if one makes an assault upon another or an attempt to commit a serious personal injury upon another, or any other circumstances equivalent to that, and passion is aroused, one's anger is aroused, and under a sudden violent impulse of passion, supposed or presumed by the law to be irresistible, and one swept on by that passion and *Page 797 
anger which has been aroused by reason of an assault upon him, or an attempt to commit a serious personal injury upon him, and before the voice of reason and humanity can assert itself, moved by that passion which the law presumes to be irresistible, he takes human life, without entertaining malice, then that is voluntary manslaughter. Now then, gentlemen, I wish to remind you that even though one attempt to commit a serious personal injury on another, and the party upon whom the assault is made afterwards kills, it may be murder. That is with the jury. There is what we lawyers refer to as cooling time. That is — where a man makes an assault on you, or attempts to commit a serious personal injury on you, or any other circumstances equivalent to that, and your passion is aroused, and you kill under such passion, as I have told you, that is voluntary manslaughter; but, you gentlemen being the sole judges of this, if you should believe that there was an assault or provocation given, or an attempt to commit a serious personal injury on the person, or any other equivalent circumstances, and passion was aroused, if you believe that there was time, not a question of whether he did cool or not, but if you believe there was time to cool off and for the voice of reason to resume its sway, then I charge you, if one takes human life under those circumstances, that is attributable to deliberate revenge and is murder. Now that is the law of voluntary manslaughter."
Exception is taken to the refusal to charge an entire group of legal principles, divided into five paragraphs and numbered consecutively "second" to "sixth" inclusive, relative to the duties and rights of the deceased officer in attempting to arrest the defendant, and of the defendant in resisting the deceased. The only request to charge appears at the beginning of the entire group, as follows, "The court is respectfully requested to charge." Paragraphs "second" and "third" each contain language making it the imperative duty of an officer to inform a person of his official character and purpose before seeking to arrest him. Paragraph "fourth" contains statements, both that it was the duty of the defendant "to have submitted to the arrest without resistance, provided he knew or the circumstances put him uponnotice that an arrest was intended," and that "if you believe that [the defendant] knew that an attempt was being made to arrest him by the deceased." This paragraph also stated, "Therefore knowledge of the official *Page 798 
character of the deceased would be of great weight in bringing home to the defendant notice of the deceased's purpose." In none of these paragraphs nor in paragraph "fifth" was there any reference to the legal rule, that belief or reasonable grounds of belief on the part of an offender as to the official character and purpose of an arresting officer are the equivalent of knowledge. Paragraph "sixth" stated, "The defendant has made his statement in which he tells you that he shot the deceased to save his own life," whereas in his statement to the jury the defendant said, "I don't know whether I had hit [the deceased] or not, because I didn't shoot at him."
Exception is also taken to the refusal of similar requests to charge as to the duty of an arresting officer to disclose his official character and purpose, making "knowledge of the officer's official character" and "purpose" essential, without referring in the same connection to the rule that belief or reasonable grounds of belief on the part of the person sought to be arrested are the equivalent of knowledge.
After charging that where an officer goes to arrest a man for a felony, it is the duty of the man to submit himself to arrest and not to resist, the judge charged: "Now you can readily understand that doctrine might be different, or could be, provided the party did not know that this was an officer. In making an arrest it is not necessary for an officer to make known his official character, unless, under the existing circumstances, there is reason for doubt that the person whose arrest is being attempted is ignorant of his official character and that his purpose is to make an arrest. Of course, if the party is engaged in the commission of a crime, even a felony, and a party comes and he has no knowledge whatever that this is an officer, he would have the right to escape or resist; he would not be under obligation then to submit to arrest, but he would be if he knew, and it would not be necessary for the officer to say, `I am the deputy sheriff.' If the surrounding circumstances are such that the person whose arrest is being attempted should know that the purpose of the officer is to make an arrest, it is his duty to submit without being told of the official character or purpose of the officer." He then charged the rule that one may not himself create an emergency, kill, and justify the killing thereunder. Exception is taken to these instructions, as legally erroneous, as failing to charge "what the duty of an arresting officer *Page 799 
was under the circumstances as established by the evidence in this case," and as argumentative for the State.
1. "An arrest for a crime may be made by an officer, either under a warrant, or without a warrant if the offense is committed in his presence, or the offender is edeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." Code, § 27-207. See Howell v. State,162 Ga. 14 (6-a) (134 S.E. 59); Thompson v. State,4 Ga. App. 649, 652 (66 S.E. 99).
(a) It is the duty of an officer, when authorized to arrest, but where the circumstances afford reason to believe that his object and official character are unknown to the person whom he seeks to arrest, so to inform him (Douglass v. State,152 Ga. 379 (3), 110 S.E. 168); but an omission to do so will not justify the person arrested, or sought to be arrested, in resisting the arrest if he in fact already knows, or on reasonable and probable grounds believes, that he is under a charge of felony for which an arrest is being attempted.Robinson v. State, 93 Ga. 77 (3) (18 S.E. 1018, 14 Am. St. R. 127). Belief or reasonable grounds of belief on the part of such an offender would be equivalent to knowledge. Croom v.State, 85 Ga. 718, 723 (11 S.E. 1035, 21 Am. St. R. 179). Where an offender thus has the equivalent of knowledge that the person making the arrest is an arresting officer, it is the duty of such person to submit quietly to arrest; and in case he refuses to submit, the officer has the right to use such force as is reasonably necessary to accomplish the arrest. Dixon v.State, 12 Ga. App. 17 (6) (76 S.E. 794); Moody v. State,120 Ga. 868 (2), 869 (48 S.E. 340); Newkirk v. State,57 Ga. App. 803, 807 (196 S.E. 911), and cit. To slay an officer to avoid being taken into custody, while having such reasonable grounds of belief that he is an arresting officer, and that his object is to make a lawful arrest for a felony, is murder. If the homicide is committed without reasonable cause to know his official character or purpose, and without malice, it is manslaughter. Croom v. State, supra.
(b) It was shown by one of the defendant's companions that *Page 800 
at the time of the homicide he and the defendant were "at that still . . operating it, stilling liquor" on the night in question. This witness testified: "LeRoy [the defendant] had a still . . [he] came with me down there. When we first came there we went there to Nath's house. . . Nath did tell us something about the still, he said he heard they had found it. . . We had to be in a hurry to get through with it. We thought the quicker we got through with it the better it would be for us. . . We come down and found the mash ready to run. We just spoke to Nath, and he told us he heard they had found it, and we wanted to run it off quick before the law got there that night; if they was coming in there, we wanted to get through." He later testified: "When he [the defendant] come out from his house, he wrapped up something in a paper. He had a gun in the paper; it was a pistol." In his statement to the jury the defendant admitted the possession of a pistol at the time of the homicide, the previous conversation with another person as to the tearing up of the still, his presence at the still with companions, and finding "everything was there just like we left it." Applying to this evidence the preceding rules of law, the jury were authorized to find that the deceased officer was empowered to make an arrest of the defendant at the time and place of the homicide; and that under the circumstances shown on the night of the homicide the defendant was then and there actually anticipating arrest, and had reasonable ground to believe that the decedent was acting in his capacity as an officer for that purpose.
(c) The instructions to the jury as to the respective duties and rights of the deceased as an arresting officer, and of the defendant in submitting to arrest or resisting, were in essential accord with the preceding legal rules, and were not contrary to such rules or argumentative, on the grounds contended.
(d) The court did not err in refusing the defendant's requests to charge as to such respective duties and rights of the deceased officer and of the defendant, since the principles stated, so far as they conformed to the preceding legal rules, and so far as they were applicable to the case, were correctly and sufficiently covered by the general charge. This ruling being controlling, it is unnecessary to determine whether or not the judge was authorized to refuse to charge a group of numbered propositions as requested en bloc, where only one request to charge preceded the entire group, *Page 801 
and where some of the requested propositions, as shown in the statement of facts, were inaccurate. See Burkhalter v.Wilson, 168 Ga. 566 (148 S.E. 399), and cit.
2. There is no merit in the exception that, while the defendant was present, his counsel were absent when the jury returned their verdict, where it appears that after the jury had been charged and had retired at the noon hour, a recess was taken to a certain time after dinner, which was stated in the presence of counsel; that when the jury returned while court was sitting, counsel were absent near by; that the court directed an officer to endeavor to locate and have counsel present, and when they did not appear "the court had the defendant brought inside the bar and in regular and lawful form polled the jury, and then declared and published the verdict;" and that an insistence on such a poll was all that counsel could have done had they been present and not waived it. O'Bannon v. State, 76 Ga. 29 (2), 31;Baldwin v. State, 138 Ga. 349, 350 (75 S.E. 324);Richards v. State, 136 Ga. 67 (2) (70 S.E. 868);Roberson v. State, 135 Ga. 654 (2), 655 (70 S.E. 175).
3. The use of the word "ideal" in a general instruction as to the duty of the jurors in considering the case and ascertaining the truth, that "it is an ideal that your minds should be like that piece of paper when you come into the jury-box, upon which neither passion nor prejudice nor bias nor partiality has been able to write anything whatever," was not erroneous, on the objection that this word meant "visionary," "phantasm," or a "fanciful standard," without "real existence," since one of the defined and generally understood meanings of the word is "a standard of perfection, beauty, or moral or physical excellence" (Webster's New International Dictionary); and in no event could the quoted use of the word have misled the jury to the prejudice of the defendant.
4. In the trial of a criminal case, even one where the defendant has not admitted his guilt but the question of his guilt or innocence is in issue, where a relevant fact, other than the essential one of guilt or innocence, has been established by uncontradicted evidence, and the defendant in his statement to the jury does not deny such fact but in effect admits it to be true, it is not error for the judge to assume or intimate to the jury that such fact is true. See Pruitt v. State, 36 Ga. App. 736
(138 S.E. 251), and cit. Accordingly, since the defendant himself in effect admitted that he *Page 802 
was engaged in the operation of an illegal still at the time and place of the homicide, and since such fact was proved by the uncontradicted testimony of witnesses, the court did not err in assuming that the deceased officer, accompanied by another deputy sheriff, went in the nighttime to "a still" which was "being operated," and that "admittedly they had no warrant at all for the arrest of this or the other parties engaged in the distillation or manufacture of liquor."
5. The instructions on voluntary manslaughter, as set forth in the statement of facts, being adapted to the testimony and to the defendant's contentions in his statement, and substantially covering without material inaccuracy all of the essential principles of the Code, § 26-1007, relating to such a homicide, the court did not err in so charging, or in refusing to charge in the exact language of the Code and as requested.
6. With respect to the contention of self-defense, the principles of the Code, §§ 26-1011 and 26-1012, relating to justifiable homicide and the necessity of showing "the fears of a reasonable man" on the part of the defendant, were given and defined with essential accuracy. The court did not err in charging that "the danger must be pressing and urgent or apparently so, and the means to carry out the injury that the party feared was at hand." Wheeler v. State, 179 Ga. 287
(5), 289 (175 S.E. 540); Tolbirt v. State, 124 Ga. 767
(4), 773 (53 S.E. 327), and cit.; Ellison v. State,137 Ga. 193 (73 S.E. 255). Under the evidence for the State, it was proper to state the rule as to creating an emergency and taking advantage thereof, as applied to self-defense. SeeDaniel v. State, 187 Ga. 411, 412 (1 S.E.2d 6), and cit. Nor were such instructions subject to the exception that they were confusing as to the law of justifiable homicide and self-defense, and the contention of the defendant; or that they excluded from the consideration of the jury "the conduct, acts, menaces, and the contemptuous gestures of the deceased" and the other officers, even if, under the evidence and the defendant's statement, the principle was involved that "while provocation by words, threats, menaces or contemptuous gestures is not sufficient to justify the excitement of passion and reduce a homicide below the grade of murder when the killing is done, not on account of any fear in the mind of the slayer, but solely to resent the provocation given, it is nevertheless *Page 803 
true that such acts may in some instances be sufficient to arouse the fears of a reasonable man that his life is in danger, the same being a question to be determined by the jury," and that where words, threats, or contemptuous gestures may thus throw light upon that question, they should not be excluded from the consideration of the jury. Johnson v. State, 105 Ga. 665
(31 S.E. 399); Cumming v. State, 99 Ga. 662 (2), 664 (27 S.E. 177); Clay v. State, 124 Ga. 795, 796 (53 S.E. 179), and cit.; Howell v. State, 162 Ga. 14, 30 (134 S.E. 59).
7. On the remaining contentions under the general grounds, relating to the absence of malice, justification, or reduction of the homicide to voluntary manslaughter, the verdict of murder was authorized by testimony for the State, that, while the officers were approaching at night the operators of the still, who anticipated a visit from officers of the law, the defendant turned his flashlight on one of the deputies, and said, according to one witness, "Here is a man; must I shoot?" and a companion of the defendant said, "Shoot," or said, according to the testimony of another companion of the defendant, "Here a man, I'm going to shoot him," and the first mentioned companion also said, "Shoot;" and that the firing by the officers did not start until after this was done and said by the defendant and his companion.
8. The court properly refused a new trial on all the grounds of the motion.
Judgment affirmed. All the Justices concur.