SHIRLEY *v.* THE STATE.

No. 6916. April 10, 1929.

*B. P. Gaillard Jr.,* and *Oscar Brown,* for plaintiff in error.

*George M. Napier, attorney-general, Pemberton Cooley, solicitor-general, T. R. Gress, assistant attorney-general, and J. B. G. Logan,* contra.

ATKINSON, J. Daniel Shirley was placed on trial for the murder of William Simmons by shooting him with a pistol. The defendant was convicted, and in the verdict was recommended to the mercy of the court. The exception is to a judgment overruling his motion for a new trial.

■ The court admitted, over the objection that it was hearsay, a declaration of the deceased, uttered about ten o'clock Saturday morning before the body was found. on the following Monday: "Pap, I have got to go off and help Daniel Shirley grind some malt." The declarant and Shirley [defendant] had engaged in a conversation, after which Shirley left going in a direction which would lead to a still. The declaration was made about thirty minutes after Shirley left, and upon making the declaration the declarant left, going in .the same direction Shirley had gone. That was the last seen of the declarant in life. His body was found near the still. In the body were two holes made by pistol bullets that caused death. The only issue upon which the declaration would be material was that of identity of the defendant as perpetrator of the crime. Upon this issue the declaration was very `material. In connection with other evidence the declaration tended to explain conduct of the deceased in going in the direction the defendant had recently gone, and his presence at the place where his body was subsequently found, and his purpose in being there.

In *Thomas* v. *State,* 67 *Ga.* 460, the third syllabus is as follows: "On a trial for murder it appeared that the defendant and deceased were living together as husband and wife; that the deceased was jealous of his attentions to another woman, and had quarreled with him about the latter; that on the night of the homicide she left her house, saying, as she went: 'There are two persons down the alley; I think it is Harp [defendant] and his sweetheart; I will go and see;' that she went, but never returned; and that the next day she was found murdered near where she expected to find defendant: *Held,* that such statements by her were admissible as part of the res gestæ." It is declared in the Penal Code (1910), § 1023: "When, in a legal investigation, information, conversations, letters and replies, and similar evidence, are facts to explain

conduct and ascertain motives, they are admitted in evidence, not as hearsay, but as original evidence." In State *v.* Pearce, 87 Kan. 457 (124 Pac. 814, Ann. Cas. 1913E, 358), it was held: "The declarations of a person who started from home with a herd of horses, as to the place to which he was going and the purpose of his journey, are admissible in evidence; and in a prosecution for the murder of the one who made such declarations, testimony regarding them may be given by the wife of the deceased." This ruling .was upon the principle, as stated in the opinion, that "Statements of one starting on a journey as to where he came from and where he is going are, ordinarily,. admissible in evidence as a part of' the res gestæ." In Ann. Cas. 1913E, 361, is an elaborate note relating to the principle stated. In this case it can not be definitely stated how long before the homicide the utterance was made; but the declaration was admissible, under the above quoted code section, to explain the conduct and purpose of the deceased in going to the place where his body was found.

■ The evidence, though entirely circumstantial, was sufficient to support the verdict.

*Judgment affirmed. All the Justices concur except Russell, C. J., and Atkinson, J., who dissent.*

ATKINSON,˙ J. (dissenting from the ruling announced in the second division). There was evidence in this case tending to show the following. Daniel Shirley and William Simmons lived about two miles apart on separate roads, and, except as otherwise indicated hereinafter, had been friendly for a number of years. There was a still on the side of Hudgins Mountain. At the base of the mountain was· a small stream called Parker's Creek, which ran down to Winn's Mill located a short distance from the mountain. On this creek and near the base of the mountain was a cultivated field in which William Simmons and his father were working on Saturday morning, when the defendant came to the field and engaged in conversation with William for about an hour. The conversation was apparently friendly, but what was said between them was not heard by the elder Simmons, who kept on at his work. The defendant left about 10 o'clock in the morning, walking up the creek in a course which would have carried him in the direction of the still and also his home. After the defendant had been gone about thirty minutes William stated to his father: "Pap, I have

got to go off and help Daniel Shirely grind some malt," and thereupon proceeded up the creek in the same direction the defendant had gone. William was never seen alive again. The elder Simmons kept working in the field, and late in the afternoon heard three pistol shots up on the mountain. He attributed them to shots at a hawk's nest which William had told him was up there. On the following Monday morning, William having failed to return home, the elder Simmons set out to look for him. He went to the defendant's home, explained the absence of William to defendant, and asked if he knew anything about him. The defendant stated that he did not know, and suggested that he might be lying in the woods somewhere drunk. The defendant was also asked about the location of the still which he and William were operating on the mountain and also the location of the hawk's nest. The defendant denied that he and William were operating a still, and stated that he did not know anything about the location of the hawk's nest. He did not offer to go to help find William. The elder Simmons returned to his home and thence to the field. From his position in the field he estimated the direction of the pistol shots, and then proceeded up the creek and thence up the side of the mountain, where he discovered the body of William. It was on a steep incline, lying on the back, with the head extending down the mountain and the feet towards the summit. The arms were crossed and so were the legs. A few feet above the body was William's pocket-book which contained a small sum of money, his 38-caliber pistol which did not contain any loaded or empty shells, and a small fruit-jar half full of whisky. The place above the body was mashed down and showed signs of people having loitered there. The still was found about 60 yards away, and the hawk's nest between the body and the still.

There were two pistol wounds on the body; one penetrated the front and ranged towards the back and the other penetrated the back just below the shoulder-blade. A physician testified that each hole was made by one ball; that the first hole was made by a ball from a 38-caliber and the latter by a 32-caliber ball; that by experiment a 38-caliber ball fit the first hole, but he could not get it in the second hole at all; that the blood from the first shot flowed downward on the body, soaking the garments, indicating that it took some time for this to occur and that death did not re-

sult immediately from this shot; that the blood from the wound in the back flowed towards the head, and quite a lot of blood was on the ground under the head, thus indicating that death resulted after the shot in the back; and that there were powder burns on the back. When the body was found decomposition had commenced; and the physician testified: "I could not say exactly how long he had been dead, but I would think it was possibly longer than one day or night." The still was a complete outfit at which were found certain sugar and sprouted corn and a sausage grinder which was used to grind malt; also certain jugs and fermented materials from which liquor would be made. The still appeared to have been operated about a week previously, but did not show evidence of being operated at the time. The sausage mill was identified as the property of William Simmons, and it appeared that he had recently sprouted certain corn and had carried it off to make whisky. The defendant and the deceased had recently been heard to converse about buying a new cap for the still and buying sugar. Tracks were found leading from the field going up the creek, and a place was found which indicated that the person or persons making the tracks had sat down on the edge of the creek, but they could not be traced up the mountain. Tracks of persons were seen along a certain trail on the mountain as also was the track of an automobile that had gone up on the mountain as far as a tree that had fallen across the trail and had turned around and gone back down the mountain. There was no peculiarity about the tracks, and they were not identified as the tracks of either the defendant or the deceased. An inquest was held on the day the body was found. The officer holding the inquest and another person went by the home of the defendant, who apparently had not heard of the homicide. The officer told the defendant about the body having been found and the holding of the inquest, and stated to him that his name had been mentioned at the inquest, but that no charge had been made against him. The defendant asked if they would not go with him to where the body was found, but was informed that they were tired and did not care to return. When informed about his name having been mentioned at the inquest the defendant asked the officer, if it was his case would he go to the funeral? to which the officer replied that he would go if he desired to do so. The defendant did not attend the funeral, which

fact was explained by him by stating that he went to the Simmons home to attend the funeral, but that no one was present and he did not know where the funeral would be, but on returning met people on the road, of whom he made inquiry and found that the funeral had already occurred.

There was evidence that, three years before the homicide, the defendant went late at night to the house of a neighbor to borrow a gun, stating that he had had a difficulty with William Simmons on the road, and he desired to go to his house "and have the trouble over again." A nephew of William Simmons testified that, a year before the homicide, Shirley stated to witness: "Your Daddy and Bill are reporting, and . . I am going to get them and get Bill first." A few days before the body was found Shirley was arrested at Alto while drunk, and called on William to help resist the officer, and on his refusal cursed him and told him "he would hate it if he didn't." At the time of that arrest Shirley had on his person a 32-caliber pistol which the officer took from him and delivered to the sheriff. While the arrest was being made Shirley cursed the officer and resisted to such an extent that it was necessary to strike him. The nature or extent of any wound inflicted by the officer on Shirley is not made to appear. On Thursday before the body was found Shirley purchased six cartridges for a 32-caliber pistol. The date of the arrest for drunkenness is not clearly set forth, it being stated in one instance that it occurred on Monday and in another on Friday preceding the finding of the body. In his statement before the jury the defendant, referring to his arrest at Alto, said: "My head nearly killed me. I had five stitches taken back here where a car hit me, and these licks on my head made my head hurt awful bad." He denied all knowledge of the homicide and participation in operating the still, and stated that in response to a request he went from his home Saturday morning to the home of William Simmons to see the latter, and upon being informed that he was at work down in the Winn Bottom he went down there and talked with him for a while in regard to some work to be done for William with a cutaway harrow, and then left, going along a path up Parker's Creek and proceeding straight on to his home, where he remained until Monday. The defendant introduced evidence tending to show his presence at his home at the time above indicated, and evidence to the effect that

his pistol had been in the possession of his brother continuously from the time the latter had obtained it from the sheriff, who had received it from the officer arresting him for drunkenness; also evidence to the effect that certain persons had walked about on the mountain, fox hunting, and on the day before the finding of the body such persons had driven an automobile up on the mountain and had walked about in search of fox tracks.

The foregoing fairly states the substance of the evidence and the prisoner's statement before the jury. The evidence was entirely circumstantial. The evidence was sufficient to authorize a finding that the defendant was engaged with the deceased in operating the still on the mountain; and this being so, the jury would have been authorized to find that the defendant made false statements in reference to the defendant's knowledge of the still and participation in its operation with the deceased. In connection with this there are the circumstances of the defendant and the deceased going in the direction of the still on the day the homicide was evidently committed; of his attitude in failing to offer to help search for William when informed that nothing had been heard from him; of his failure to show a friendly or neighborly interest by attending the funeral; of the making of threats and the use of the recent language addressed to William at the time of arrest for drunkenness, implying a threat; also that the defendant had a 32-caliber pistol and had recently purchased cartridges for a pistol of that caliber. All these circumstances are consistent with the guilt of the defendant and are sufficient to raise a suspicion against him; but these alone, or considered in connection with all the circumstances in the case, are not sufficient to exclude every reasonable hypothesis save that of the guilt of the accused. The character of the place was such as persons inclined to lawlessness or violence would likely visit. The manner in which the ground was marked indicated the recent presence of a number of people. That William Simmons went to the place there can be no doubt. The presence and condition of his body make that clear. But whom did he find there, or who came while he was there? The evidence does not disclose; neither does it disclose that Daniel Shirley went to the place. He was killed by being shot with two different pistols. There is a reasonable hypothesis that William reached the place Saturday morning shortly after leaving his father in the field, and

remained there and got into a drunken broil late in the evening, when the pistol shots were heard, with two or more undisclosed persons who had come to the still, and at that time Shirley was at his home. The main fact is that the deceased was killed by shots from two pistols carrying balls of different caliber. This fact can not be put aside. It is declared in the Penal Code (1910), § 1010: "To warrant a conviction on circumstantial evidence, the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused." In *Sikes* v. *State,* 120 *Ga.* 494 (48 S. E. 153), it was said: "In all cases the burden is upon the State. It is only half carried when it establishes an hypothesis of guilt but leaves also an hypothesis of innocence. Which of the two shall the jury take? If both theories are consistent with the proved facts, the very uncertainty, as to which is correct, requires that the jury should give the benefit of the doubt to the defendant. But when the tables are turned, and the defendant relies on circumstantial evidence, he is not obliged to remove the doubt. It is sufficient if he creates a reasonable doubt. He is not obliged to prove his innocence, but may rely on the failure of the State to establish his guilt. Hence, if the defendant relies on circumstantial evidence to establish his innocence, and the proved facts establish an hypothesis consistent with his innocence and sufficient to create a reasonable doubt of his guilt, this is sufficient, and it is not necessary that he should go further in his proof and exclude every possible idea of his guilt."

In *Green* v. *State,* 111 *Ga.* 139 (36 S. E. 609) the circumstances relied on to connect the defendant with the alleged offense of arson were as strong if not stronger than the circumstances in the present case, and they were held to be insufficient to convict. It was said, in the opinion: "We think that the evidence was not sufficient to authorize the verdict. It was entirely circumstantial, and in no way connected the accused with the arson. The law does not permit any one to be convicted upon mere suspicion. If the evidence be circumstantial, it must connect the accused with the offense so as to exclude every other reasonable hypothesis than that of his guilt. It is possible that Green was guilty of the arson with which he was charged, but the State has not produced sufficient evidence to show beyond a reasonable doubt that he was

so." In *Williams* v. *State*, 113 *Ga.* 721 (39 S. E. 487), it was held: "The evidence against the accused was entirely circumstantial, and, while it raised a suspicion of his guilt, was not sufficient, though given its strongest intendment as against him, to exclude every other reasonable hypothesis. It was, therefore, error to refuse a new trial." The circumstances in that case relied on to connect the accused with the alleged offense of murder were also stronger than the circumstances in the present case. In the opinion it was said: "The rule of law laid down by our code, as above quoted, is a wise one. It is taken from the common law, and has been the rule in this country and in England for centuries. Under this rule, if the State relies upon circumstantial evidence, that evidence must be so strong as to exclude every other reasonable hypothesis save that of the guilt of the accused. It must be inconsistent with his innocence. This court has ruled on several occasions that, in cases involving life or liberty, this rule must not be relaxed. When a heinous crime has been committed in a community and the people are greatly shocked thereby, it is natural for them to catch at any little circumstance to throw suspicion upon some person and to conclude from this or that circumstance that he is the guilty party. The horror of the crime, and their desire, as good citizens, to see the guilty party punished and the law vindicated, frequently lead them to premature judgment which oftentimes follows them into the jury-box, where, as jurymen, they not infrequently find persons guilty on bare suspicion alone. This is demonstrated by the records of cases passed upon by this court, commencing with the earlier volumes of our reports and continuing almost to the last one. For a reference to some of these cases, see *Bell* v. *State*, 93 *Ga.* 557" (19 S. E. 244). Applying these principles to the facts of the case under consideration as hereinbefore substantially set forth, the evidence was insufficient to connect the defendant with the murder of William Simmons, as charged in the indictment, and it was erroneous to refuse defendant's motion for a new trial.

Mr. Chief Justice Russell concurs in the foregoing dissent.