THOMPSON *v.* THE STATE.

No. 13337. OCTOBER 19, 1940. REHEARING DENIED NOVEMBER 20, 1940.

*G. B. Everitt* and *R. L. Carr,* for plaintiff in error.

*Ellis G. Arnall, attorney-general, R. L. Dawson, solicitor-general, P. M. Anderson, Duke Davis* and *C. E. Gregory Jr., assistant attorneys-general,* contra.

BELL, Justice. Luther Thompson was indicted for the offense of murder in the killing of his wife, Mamie Thompson, by shooting her with a shotgun on October 19, 1939. He was convicted of that offense, without recommendation, and was sentenced to be electrocuted. His motion for a new trial, consisting of the general grounds and several special grounds added by amendment, was overruled, and he excepted.

The evidence showed that the accused and his wife had been living in a state of discord for some time. He worked in the woods, and was away from home most of the time. He was addicted to drink, and rarely ever came home sober. On several occasions he made threats against his wife, some directly to her. A few days before the homicide his wife, in company with her brother, Byron Rogers, went to Glennville and employed an attorney for the purpose of filing a suit against the defendant for alimony. The suit was filed October 14, 1939, and served on the defendant on October 18, 1939. It contained prayers for alimony, and for injunction to restrain the defendant from going to the home of

petitioner and from molesting or interfering with her in any way. On the next day after the petition was served, the defendant went to his home, and found there only his daughter, Ruby Lee, his son "Buck," eighteen years of age and referred to by Ruby Lee as her "older brother," and a small child whose name does not appear. His wife was absent, having gone with her brother, Byron Rogers, to Glennville. They returned after a short while. Mrs. Thompson got out of the car and went into the house. Byron Rogers was about to drive away when the defendant, who was still about the home, came from behind the house and shot at Rogers with a single-barrel shotgun which the evidence tended to show was loaded with buckshot, some of which struck and injured Rogers. As Rogers was about to drive away in his automobile or truck, he heard Mrs. Thompson and Ruby Lee calling to him and begging him not to leave them. In the meantime Mrs. Thompson had returned to the front porch. The son also came out of the house, bringing with him a .22 rifle. The defendant reloaded his gun, shot and killed his wife, and injured his son. The evidence showed that the mother and the son came on the porch only after the shooting of Rogers, and that the son made no endeavor to use the rifle. He was standing between his mother and the defendant at the time the fatal shot was fired, and was holding the barrel of the rifle in hand, with the butt on the floor. The gun was fired only one time in the direction of Mrs. Thompson and the son, so that they were both injured by a single discharge from the gun. Mrs. Thompson fell to the floor and died almost instantly. The son had not recovered from his wounds at the time of the trial in December following, and was unable to attend the trial as a witness. The defendant immediately disappeared, but in about an hour an officer discovered him lying in an unconscious condition about two hundred yards back of the house, with a wound over his heart and another in his head, both apparently inflicted with a .41 derringer, which, together with the shotgun, was lying a few feet from his body. As we read the briefs, it is apparently conceded on both sides that the wounds on the defendant were self-inflicted. So far as shown, he had recovered from these wounds at the time of the trial.

The foregoing is not intended as an exhaustive statement, but it represents in a general way the only version which the jury could have adopted from the evidence. The defendant introduced some

evidence and also made a statement. He undertook to assert the defense of insanity, and for the purpose of this decision we may assume that the evidence was sufficient to present an issue as to that defense.

His statement was as follows: "Gentlemen, I had a sight of trouble with my family, her brother and my wife. This one here, it was, had been between me and my wife for a good while, especially this year, and I had asked the young man to stay out of my affairs and leave us alone; in other words I had gone ahead and built the place up on her land, putting out money and carried lumber there. I had had trouble with him, hard feelings off and on, I didn't visit him, hadn't been to his house in several years or him to mine, except one time, in three or four years, and we lived right there together. I hadn't been to his house but one time, and he had been to mine twice up to then, up to the time he come between me and my wife. In other words, when the time come to sell the crop they went and sold it. I didn't know, they didn't show me no bills, and carried it off and they sold it. In other words, I got on to my wife when they began to sell the crop. I was working in the woods, been working in the same woods for three years. I was at home Saturday night and Sundays and some nights during the week. On Saturday evening before, when I come home from the woods they said they had took out papers against me, and I went to town to investigate the papers. I tried to get my wife to go with me to her brother and talk the matter over with him, and she wouldn't go. I went to town and asked him to go with me to her, and he said no, that he wouldn't go, and I asked him if I had tore up his life like he had me, what he would do, and he said he didn't know, and that he thought he was doing the right thing; and I mentioned to him about them digging the potatoes there, and told him that they tell me she has been washing at your house; well, she didn't have to do that, there was plenty there. She sold the crop and got the proceeds; and I asked him about the potatoes, and he said he didn't have anything to do with it; and I said 'Why are you doing there, why did you send and get her Saturday morning and take her to town?' I said, 'I offered to take her, but you sent some time of the day and got her,' and he said, 'I ain't had nothing to do with it and ain't going to have nothing else to do with it.' When I talked to my wife she said that it was her brothers, that they

took up for her, and that they said they would get me, and I said 'I won't want that.' I was trying to compromise these papers. I went there on Tuesday morning. I had had so much trouble I didn't realize what I was doing. On the night before I went and talked with her, and she said she would withdraw the papers and let's get back together. I went there that morning. I didn't know she was in town or anything, thought she was at home, and I was going to talk to her. I didn't know he took her to town to take out more papers. So when they come up, they drove up and she got out of the truck. When I went in the house my girl was in the kitchen, and the boy was sitting down in the front room. I went in and asked where my little boy was. I had one baby and another larger boy. I asked where was the baby, and they said it was staying at Aunt Amie's, said mamma had gone to town. I didn't ask any further questions about why she went to town. Me and the boy talked about going back to the woods where we were working; he had been working in the woods with me. So when they drove up she got out of the truck, and I said to myself I will go out and see what Byron has got to say. When I started out, she said, 'Here he is; come and get him.' Well, I made it for my gun and jumped out of the window, and she hollered for the boy, and he rose, and she said, 'Go get your rifle,' and when I rounded the house I shot him. Well, they was in the house getting the rifle, I knew from what him and her told me. Me and him had had some trouble when I would try to correct him, had trouble with him and her when I would try to correct my family; both of them jumped on me. Well, I knew I would have trouble when she hollered to him to get the rifle, I knew where it was, and I looked through the window and saw them run out with the rifle, and I shot. I didn't realize, and didn't look back to see what happened, didn't shoot at no one; they just run out with the rifle, and I shot. Then when I come up here they kept all my children, they have them there, had them all the year. I haven't saw one of them or spoke to one of them. My girl sent word up here by the deputy sheriff, Dubose, that they wanted to take my baby; and I sent word for them to see me, wrote them to come. I got information that they said they were going to hold the children and everything else. I don't know what they are doing, anything of the kind. I haven't seen them or spoke to them since then."

■ In the first special ground of the motion for new trial, the movant complained of the ruling of the court admitting in evidence the suit for alimony and injunction, together with the entries thereon, and allowing the same to be taken by the jury to the jury-room. This ground recites that movant objected to this documentary evidence and "to same going out with the jury, as hearsay and prejudicial to movant; and movant's objections were sustained by the court, except the court ruled and stated, 'I am not going to admit the allegations of the petition, but I think I will the part that shows that a suit was filed seeking certain things, alimony and an injunction. I think they are admissible. I am not going to admit all of the petition. I am going to admit so much of that petition as shows a suit was filed, that it was for alimony and an injunction, and that service was made and the date of each; the rest is not admitted. I will instruct the jury as to what part I am admitting; the part that I just said was admitted for the purpose of motive.'" The motion further recites that the court did instruct the jury as follows: "Gentlemen, here is a petition which the wife filed against the defendant, for alimony and injunction. I can't tear it apart; all of it will have to go to your room, but I instruct you the only part of it that is admitted as evidence is the part that shows the date it was filed and the date the defendant was served, and the prayers that she is seeking alimony and an injunction. Any statement in the pleadings other than that is not evidence and not necessary for you to read; but if you do read it, disregard the balance, because it is not evidence." The petition alleged acts of cruelty, threats against the life of petitioner, and failure to support her and the children. It is contended that these allegations were not evidence, but were mere hearsay and highly prejudicial to movant. This ground does not show reversible error. A somewhat similar situation was dealt with in *Fortenberry* v. *State,* 175 *Ga.* 317 (165 S. E. 215), as to which it was said: "The objection . . is to the whole record. No particular part is indicated as being objectionable; and therefore, if any part of the record is admissible, it was not error, over the objection made, to admit the entire record. . . The record was admissible for the purpose of showing motive on the part of the accused for the murder of his wife. It is urged that the documentary evidence was inadmissible, because it was hearsay, and because the wife had, in

writing and under oath, charged the defendant with threatening to kill her, and, since defendant was then on trial for having killed her, the same was very damaging and prejudicial, and tended to arouse and inflame the jury and to create bias in their minds against him. The paragraph of the petition for divorce which alleges threats was denied in the answer, and the answer went to the jury along with the allegation of threats. As stated above, however, that part of the petition was not pointed out and made the subject of specific objection, as it could have been if the accused desired to avail himself of the objection. Some parts of the record were certainly admissible, and by the failure to point out the objectionable part, assuming for present purposes that it was objectionable, the movant failed to make a good objection." Accordingly, in the instant case, there is no merit in this ground.

■ It appeared from the testimony of Ruby Lee Thompson, daughter of the accused, that she was at the cow lot when the first shot was fired. She immediately ran to the scene of the trouble, and after her mother fell, "took up the baby and left." While she was on the stand testifying as a witness for the State, the defendant's attorney propounded to her on cross-examination this question: "You don't know that your brother ran and got the rifle and came out?" whereupon the court stated, "Mr. Carr, she said she was at the cow lot, and it is useless to ask if she denies certain things when she states she wasn't present." It is complained that this statement restricted the defendant in his right to a "thorough and sifting cross-examination of an important eye witness for the State, one of the contentions of the defendant . . being that as the truck containing Mrs. Thompson, the deceased, and her brother Mr. Rogers, drove up to movant's house, Mrs. Thompson alighted from the truck and called to her brother and said, 'Now is the time to get him,' and movant says that said ruling of the court was, for the reason stated, error and prejudicial to his defense." There is no merit in this ground, it appearing from the record that the attorney was later permitted to cross-examine the witness upon the identical point, and that she testified, "My brother ran out and asked mamma what to do, and she said, 'I can't tell you;' my brother ran out with the rifle in his hand like that." Even if evidence is erroneously excluded, the error is cured where substantially the same evidence from the same witness is later admitted.

*Stewart* v. *Ellis,* 130 *Ga.* 685 (61 S. E. 597); *Lee* v. *Winkles,* 131 *Ga.* 577 (62 S. E. 820); *Williams* v. *State,* 177 *Ga.* 391 (3) (170 S. E. 281); *Jones* v. *State,* 27 *Ga. App.* 574 (4) (109 S. E. 515).

■ In the third special ground it is contended that the court committed error as follows: "In not permitting movant's counsel to ask J. Henry Kennedy, a witness for the defendant and movant, the following question on a material matter, namely, the subject of sanity or insanity of movant, one of movant's defenses being that he was insane at the time of the commission of the alleged offense: 'What would you say with reference to sanity or insanity [of defendant]?' to which question the State objected unless the foundation was laid showing the witness to be an expert witness, and the court ruled: 'I think he may show by this witness, if he knows, the acts and conduct of the defendant; but as to this man's opinion as to what those acts indicate, I think that is for the jury, he not having qualified as an expert; you may ask him about any acts if you want to.'" It appears from the record that the same witness later testified: "There was one time since he has been in there [in jail] that he wasn't normal. I was sent for to go there, and I went, and he acted like a crazy man to me. . . As to whether on that occasion I would say that he was sane or insane, he acted like a crazy man to me." This ground might be disposed of adversely to the movant, under the principle referred to in the preceding division; but there is an additional reason why it fails to show error. Kennedy was testifying on direct examination as a witness for the defendant, and was not permitted by the court to answer a question propounded by the defendant's attorney. As assignment of error on refusal of the judge to allow a witness to answer a question on direct examination is incomplete where it does not show what answer was expected, and that the court was so informed by counsel at the time. Under this rule, ground 3 is insufficient to present any question for decision. *Cobb* v. *Coffey,* 149 *Ga.* 264 (99 S. E. 864); *Eliopolo* v. *Eicholz,* 161 *Ga.* 823 (3) (131 S. E. 889); *Powell* v. *Harrison,* 180 *Ga.* 197 (2) (178 S. E. 745).

■ The next two grounds will be considered together. Ground 4 complained of the following charge: "The law presumes every person to be of sound mind; and when a defendant seeks to excuse his conduct on the ground of mental incapacity, the burden is on

him to satisfy the jury by evidence, to a reasonable certainty, that he was not of sound mind at the time of the commission of the act." It is contended that this charge contained an incorrect statement of the law, and placed an undue burden on the defendant, in that he must establish such defense, not to a reasonable certainty, but by a preponderance of the evidence. There has been some confusion in the decisions as to what is a correct charge in such case. On the general subject see *Polk* v. *State,* 148 *Ga.* 34 (5) (95 S. E. 988) ; *Bowden* v. *State,* 151 *Ga.* 336 (3) (106 S. E. 575) ; *Currie* v. *State,* 153 *Ga.* 178 (2) (111 S. E. 727) ; *Goosby* v. *State,* 153 *Ga.* 496 (8) (112 S. E. 467) ; *Clark* v. *State,* 167 *Ga.* 341, 344 (145 S. E. 647) ; *Lively* v. *State,* 178 *Ga.* 693 (9), 699 (173 S. E. 836) ; *Rozier* v. *State,* 185 *Ga.* 317, 319 (195 S. E. 172) ; *Barker* v. *State,* 188 *Ga.* 332 (2), 335 (4 S. E. 2d, 31) ; *Hobbs* v. *State,* 8 *Ga. App.* 53 (4) (68 S. E. 515). The trouble has been in choosing between the phrases, "to a reasonable certainty" and "to the reasonable satisfaction of the jury." Whether or not the two phrases really mean the same thing (see dissenting opinion in *Currie* v. *State,* supra), it must be conceded that the latter is somewhat clearer, and therefore it is to be commended as the better form of charge. A good statement based on authority was made by Mr. Chief Justice Reid in *Barker* v. *State,* supra, to the effect that the burden is on the defendant to show such defense, "not beyond a reasonable doubt, but to the reasonable satisfaction of the jury, by a preponderance of the evidence." A charge in this language could hardly be subject to criticism either as being unsound or as lacking in clarity. Despite the inconsistency in the decisions, and whether or not the charge complained of in the present case would require a reversal if no other instruction on the subject had been given, we are of the opinion that, if it constituted error at all, the error was fully cured by the following instruction later given by the court : "In this case if you find that the defendant committed the act charged against him in this bill of indictment, and in the manner therein charged, but at the time of its commission he was not mentally capable of distinguishing between right and wrong with reference to such act, under the instructions hereinbefore given you, then you should acquit him. Likewise, if you have a reasonable doubt as to this, you should give him the benefit of such doubt and acquit him." Nothing contrary to the con-

clusion just stated has been held in any of the cases, and it finds direct support in *Polk* v. *State,* supra. The charge last quoted stated substantially the same principle which it is contended the court erred in failing to charge; and consequently there is no merit in ground 5. This latter charge was more ample and explicit than that which was held in *Currie* v. *State,* 156 *Ga.* 85 (3), 88 (118 S. E. 724), two Justices dissenting, to be sufficient, in the absence of request, "to give the accused the benefit of all the evidence relating to his alleged insanity, for the purpose of casting a doubt upon his guilt."

In ground 6 the movant assigned error on the failure of the court to charge stated principles of law relating to the offense of voluntary manslaughter, and especially as it pertains to "other equivalent circumstances." We do not deem it necessary to discuss with particularity the evidence which it is claimed presented an issue as to voluntary manslaughter. We have carefully examined every particle of the evidence, and have reached the conclusion that no such issue was presented thereby. If this grade of homicide was at all involved, the issue was presented only by the defendant's statement; and consequently the mere failure to charge thereon was not error, there being no request. *Felder* v. *Slate,* 149 *Ga.* 538 (1-*a*) (101 S. E. 179) ; *McLendon* v. *State,* 172 *Ga.* 267 (2) (157 S. E. 475) ; *Davis* v. *State,* 178 *Ga.* 203 (172 S. E. 559).

In ground 7 it is contended that the court erred in admitting the following testimony of A. D. Dasher, a witness for the State, relating to a conversation with Mrs. Thompson, the deceased: "She said she was scared to go by herself, and asked me to go with her," the objection being that the statement of Mrs. Thompson was not made in the presence of the accused but was made in his absence. The record shows that on the night before the homicide, Mrs. Thompson was at the home of a sister when the defendant came by in an automobile and inquired for her. As to what occurred on this occasion, the witness Dasher testified as follows: "I saw Mr. Thompson there that night; he came there while I was there. She was there at her sister's home. There was another fellow with the defendant, and they called for his wife, and she said she was scared to go by herself, and asked me to go with her; that is the reason I went out. When I got there I didn't go right up to the defendant I heard him talk, but I didn't pay no attention. I was

talking to the other fellow; then I went on to where he was at. He said 'Mamie, I want you to tell me one damn thing,' and she said, 'What is that?' and he said, 'I want you to tell me what you want me to do,' and she said, 'Come back and stay with your family like a man ought to, and behave yourself. I would rather you would do that than anything in the world.' He didn't say a word, and she turned and went back in the house; and after she left he said, 'That is a hell of an answer, ain't it?' After she went back in he got out of the car, and he fell down side of the running-board of the car and took hold of the door and got up in the seat. He was drunk, I would say; he took a drink of liquor there, or something out of a bottle, while he was sitting there; it smelled like whisky." In the circumstances, and in view of the entire record, the admission of the testimony objected to was not cause for a new trial. It was admissible for the purpose of illustrating conduct and motive on the part of the wife. The statement made by her was a declaration accompanying an act which the defendant himself had requested her to perform; that is, that she come out of the house to see him. Code, § 38-202; *Shirley* v. *State,* 168 *Ga.* 344 (148 S. E. 91) ; *Aiken* v. *State,* 170 *Ga.* 895 (6) (154 S. E. 368). Furthermore, it appeared *without dispute* from other evidence that the defendant had recently threatened his wife, more than once, either with death or violence, and that she had every reason to be afraid of him. He did not deny any of such evidence as to threats; and so the evidence objected to related to a matter as to which there was really no issue upon the trial. See *Martin* v. *State,* 44 *Ga. App.* 276 (5) (161 S. E. 371). As to this point the case differs from *Woolfolk* v. *State,* 81 *Ga.* 551 (3) (8 S. E. 724), *Tiget* v. *State,* 110 *Ga.* 244 (34 S. E. 1023), *McCray* v. *State,* 134 *Ga.* 416 (7) (68 S. E. 62), and *Lance* v. *State,* 166 *Ga.* 15 (7) (142 S. E. 105), relating to isolated hearsay statements prejudicial to the accused.

■ In ground 8 error is assigned upon the following charge: "I charge you, gentlemen, the law presumes every homicide to be malicious until the contrary appears from circumstances of alleviation, excuse, or justification. And it is incumbent on a defendant, when a homicide has been proven to be done by him, to make out such circumstances to the satisfaction of the jury, unless they appear from the evidence produced against him." It is alleged that

this charge was erroneous, for the reasons: "(a) the court failed to charge in connection therewith that if there was any evidence of alleviation, justification, or excuse, the burden would shift back to the State to show beyond a reasonable doubt that the homicide was malicious; (b) because it left the burden on the defendant throughout the trial to show lack of malice, unless it appeared from evidence produced against him; and for the reasons stated the burden placed on movant by said charge was too great." The first assignment of error is clearly without merit under the rule that a complete and accurate charge is not erroneous merely because it fails to embrace some other instruction which may be appropriate in connection therewith. *Peeples* v. *Rudulph,* 153 *Ga.* 17 (2) (111 S. E. 548) ; *Currie* v. *State,* 153 *Ga.* 178, supra. Nor was the charge subject to the second criticism in the assignment of error.

The court charged the jury as follows: "I charge you in this case, if you believe the defendant by his own conduct created an emergency or an apparent emergency such as would have caused or made the son of the deceased, as a reasonable man, believe he or his mother was about to be unlawfully assaulted, and that acting under such conditions the son undertook to defend himself and his mother, or his mother, and the defendant then shot to repel an apparent danger to him of an assault, I charge you the defendant would not be justified in defending himself from a condition that he himself brought about, if you find that to be the truth of the case." The movant averred that such charge was error for the reasons: "(a) It impressed the jury with the alleged fact an emergency had been created by the defendant; (b) by naming 'the defendant' and referring to the 'son' of the deceased, it had the effect of an (unintentional) expression of opinion on the part of the court as to what had been proven, there being evidence that movant shot Byron Rogers and then shot the wife and son of movant on the front porch of their home, and that the son had a rifle in his hand, and there being evidence of threats having been previously made by movant against Mrs. Thompson, the deceased; (c) failed to charge in the same connection that if there was no emergency created by the defendant, that such charge should be disregarded; said charge being assigned as error and harmful to movant for the reasons assigned." It is a familiar principle that one can not

234

create an emergency which renders it necessary for another to defend himself, and then take advantage of the effort of such other person to do so. *Parham* v. *State,* 180 *Ga.* 233 (178 S. E. 648); *Daniel* v. *State,* 187 *Ga.* 411 (1 S. E. 2d, 6). The instruction here complained of accorded with this principle, and was not erroneous because it referred in terms to the parties, or for other reason assigned. *Daniels* v. *State,* 162 *Ga.* 366 (2) (133 S. E. 866).

■ The evidence authorized the verdict, and the court did not err in refusing a new trial.

<div align="center">

*Judgment affirmed.* *All the Justices concur.*