1. While it is declared in the Code, § 38-1708, that, "Where the question under examination, and to be decided by the jury, shall be one of opinion, any witness may swear to his opinion or belief, giving his reasons therefor," this provision does not authorize a party to elicit an opinion of a nonexpert witness based on a fact or condition as to which the witness himself has not testified. Accordingly, upon *Page 202 
the trial of the instant murder case, in which the defendant urged the defense of insanity, the court did not err in excluding the following question, propounded to a witness for the State on cross-examination, "Do you think a man that would go to your house with his gun perfectly sober you would say looking for his wife, acting like he did there, is a man of good sense?" since the question assumed that the defendant was perfectly sober, whereas the witness had testified that he "seemed to be drinking." Sanderlin v. Sanderlin, 24 Ga. 583
(1); Thompson v. Ammons, 160 Ga. 886 (1) (129 S.E. 539). See also, in this connection, Brunswick Birmingham R. Co. v. Hoodenpyle, 129 Ga. 174 (6) (58 S.E. 705); Heaton v. Hayes, 188 Ga. 632, 633 (2c) (4 S.E.2d 570).
2. Error was assigned upon the following charge to the jury: "In other words, gentlemen, if the defendant had sufficient reason to distinguish between right and wrong, he is criminally responsible. The law presumes all persons to be of sound mind and memory, and that the burden is upon the accused to rebut that presumption by a preponderance of the evidence, but not beyond a reasonable doubt." Held, that this charge was not erroneous, either because it did not define preponderance of evidence, or because it did not state in terms that the burden was on the defendant to rebut such presumption of sanity, not beyond a reasonable doubt, but to the reasonable satisfaction of the jury, by a preponderance of the evidence; and especially is this true, since the court further charged the jury that, if all the facts and circumstances were sufficient to generate in their minds a reasonable doubt as to the sanity of the accused at the time of the alleged homicide, they should give him the benefit of such doubt and acquit him. Currie v. State, 156 Ga. 85 (3) (118 S.E. 724); Barker v. State, 188 Ga. 332 (2) (4 S.E.2d 31); Minder v. State, 113 Ga. 772 (3) (39 S.E. 284). This ruling accords with the decisions in Beck v. State, 76 Ga. 452 (7), Keener v. State, 97 Ga. 388 (3) (24 S.E. 28), Allams v. State, 123 Ga. 500 (1) (51 S.E. 506), and Lively v. State, 178 Ga. 693 (6), 699 (9) (173 S.E. 836), cited for the plaintiff in error. See especially Thompson v. State, 191 Ga. 222 (4) (11 S.E.2d 795), as to "reasonable satisfaction of the jury."
3. Under the facts of the instant case, the following charge, "Justifiable homicide is the killing of a human being in self defense or in defense of one's person or habitation against one who manifestly intends or endeavors, by violence or surprise, to commit a felony upon such person," was not erroneous, as insisted, upon the ground that it limited the defendant to a defense of his person, whereas under the Code, § 26-1011, the defendant had the right to defend against the commission of a felony upon his habitation, property, person, or "either." The defendant made no statement to the jury, and there was no evidence that the officers (a sheriff and a county policeman) killed by the defendant went to the defendant's home for any purpose other than to arrest him under a valid warrant, or that they committed or threatened to commit any injury to habitation or property or even to person; and this being true, the fact that the judge, in his charge to the jury (on the trial for killing the sheriff), used the phrase "upon such person" instead of the phrase "or either," as contained in the Code, can not be taken as affording *Page 203 
the defendant any ground of complaint. Dill v. State, 106 Ga. 683 (4) (32 S.E. 660); Green v. State, 153 Ga. 215
(4) (111 S.E. 916); Ward v. State, 184 Ga. 566 (2) (191 S.E.2d 916); Turner v. State, 190 Ga. 316
(9 S.E.2d 270); Cady v. State, 198 Ga. 99, 112 (12) (31 S.E.2d 38).
(a) Nor was the doctrine of reasonable fears involved, under any phase of the evidence.
(b) Under the preceding rulings, there was no merit in ground 6 of the motion for new trial, complaining of the charge on justifiable homicide, as quoted, supra, or in grounds 7 and 8, complaining of omissions to charge. The case differs materially on its facts from Smith v. State, 106 Ga. 673
(4) (32 S.E. 851, 71 Am. St. R. 286), and Palmour v. State, 116 Ga. 269 (42 S.E. 512).
4. The killing of an arresting officer to avoid being taken into custody, knowing or having reasonable ground to believe that he is an arresting officer and that his object is to make a lawful arrest, is murder; but if it is done "suddenly, without knowledge of his purpose or official character, and without malice, it is manslaughter. Belief, or reasonable grounds of belief, would be equivalent to knowledge." Croom v. State, 85 Ga. 718 (1) (11 S.E. 1035, 21 Am. St. R. 179); Snelling v. State, 87 Ga. 50 (13 S.E. 154); Morton v. State, 190 Ga. 792, 799 (1a) (10 S.E.2d 836); Mullis
v. State, 196 Ga. 569, 577 (3) (27 S.E.2d 91).
(a) In this case the evidence as a whole, including testimony as to statements voluntarily made by the defendant before and after the homicides, showed without dispute that he either knew or had reasonable ground to believe that the persons killed by him were arresting officers and that they had come to his home for the sole purpose of lawfully arresting him. Accordingly, the offense of voluntary manslaughter was not involved, and the judge did not err in failing to charge the law applicable to such offense.
5. The testimony of the son of the deceased sheriff, with respect to a confession, was sufficient to authorize a finding that the confession was freely and voluntarily made, and the court did not err in refusing to exclude such testimony. Hinson v. State, 152 Ga. 243 (2) (109 S.E. 661); Bradberry v. State, 170 Ga. 859 (4) (154 S.E. 344); Simmons v. State, 181 Ga. 761 (4, 5) (184 S.E. 291). The record does not support the contention that the witness testified that the accused was "scared."
6. Under the evidence, the jury were authorized to find against the defense of insanity. The evidence was sufficient to support the verdict, and the court did not err in refusing a new trial.
Judgment affirmed. All the Justicesconcur.
 No. 15487. SEPTEMBER 5, 1946.
Alton Murray, alias Buddy Murray, was convicted of murder in the killing of T. W. Brantley, by shooting him with a shotgun, on *Page 204 
November 7, 1945; the verdict containing no recommendation. The defendant's motion for a new trial, consisting of the general grounds and several special grounds added by amendment, was overruled, and he excepted.
It appeared from the evidence that Brantley was the sheriff of Candler County, in which the killing occurred, and that Brantley and Willie B. Jones, a county police officer, went to the home of Murray during the morning of November 7, for the purpose of arresting him under a warrant sworn out by his wife, Sadie Bell Murray, and charging him with the offense of assault with intent to murder. Mrs. Murray and her two daughters, who were step-daughters of the accused, had left home some time during the previous night, but the cause of their leaving was not clearly shown by the evidence. They went to the home of a neighbor, and the defendant went there looking for them, but they had secreted themselves and he did not find them. There was no eyewitness to the killing, but Dewberry Collins, another neighbor, was in the home of the defendant and talked with him a short while before it occurred. At that time, the only other persons at the defendant's home were his infant child, about one year old, and his mother-in-law, an invalid. Collins left the house to return to his own home just as the officers were arriving, but sensing trouble, stopped behind a nearby tobacco barn. He heard the shooting, and saw and talked with the accused immediately afterwards. He testified that only two shots were fired. He and other witnesses testified that the dead body of the sheriff was found on the front porch near the door entering the dwelling house, and that the body of the police officer was lying on the ground at one end of the porch. The warrant for the arrest of Murray was found on the person of the sheriff, in one of his pockets. His pistol was lying near his right side. A witness testified that there was no way of telling whether it fell from his holster or from his hand. The pistol of officer Jones was in his holster. Dewberry Collins testified in part as follows:
"I went up to Alton Murray's home on the morning of the 7th of November 1945 to see about grinding some cane. . . Mr. Murray's wife is named Sadie Bell. I did not see her that morning, she has got two other children besides the baby that I saw there that morning. While I was there with Mr. Murray he said something about where the other members of the family were, he *Page 205 
told me he went to wash his feet and they dashed, he did not say when it was that they made a dash, but sometime the night though; he said he thought they went to Mr. Coursey's, he did not say anything about whether or not he was expecting them to go to some other place. While I was there I noticed some firearms, I noticed a 22 rifle and a double-barrel shotgun; the rifle and shotgun were in the right room, there was a little trunk side of the fireplace, and the stocks were on the floor and the barrels were on the trunk. . . As to whether there was any mention made about those guns while I was in there, I mentioned myself one time, if I was him I would put them up, and he said the law may come after him, and when he said that he said he was going to kill the first one come, he said why he was expecting the law, that the law might come after him, he said his wife might go off and take a warrant for him, something like that. While I was there I could tell he was under the influence of drink, whisky. I noticed that he went and stepped to the porch out there at the other end and I noticed him vomiting down there at the lower end of the porch on the back of the house. I did not detect that there was any odor of whisky on his breath, I did not smell it, I did not see him drink anything while I was there. . . I did not see anybody drive up at the front, I did not discover that there was anybody at the front until we walked to . . the front door . . when I discovered there was somebody out there, that was the hall door leading on to the front porch. As to what I saw when I walked to the front door — he seen them, he discovered them before I did, and he said, `There they is,' so he went back, he whirled and went back to the room . . he turned around there at the hall door. I came down the doorsteps, I came on out the front doorsteps. I saw Mr. T. W. Brantley and Mr. Willie Jones there, I couldn't remember when I first saw them, there was one on the left side and one on the right, I mean there was one on the left of the car and one on the right of the car. We discovered who they were while we were standing in the door; both of the men had already gotten out of the car; the gate was twelve yards from the front doorsteps, and the automobile was about eight or ten steps, or yards, from the front gate on the outside. When Mr. Murray turned back into the house and I walked down the steps, I met the officers at the gate, the officers did not come in after I went out, I waited for them to come to the gate, I said *Page 206 
something to them, I said, `Boys, watch your step, he has got his gun and it is loaded.' If the officers made any reply to me, I didn't hear them, I then went around the barn and the officers proceeded on to the house, right on, and I went around the barn . . the reason I took the course I did I was listening for some guns to fire, in other words I was expecting something was going to happen; I had got to the side of the tobacco barn when I heard the gun fire, I had gotten far enough so as to have the tobacco barn between me and the front door of the house. . . I heard two shots fired, those shots were about ten seconds apart (the witness describes by clapping his hands). After I heard those shots fired, I walked out back towards the house, so I could see the house; when I got out from behind the barn, I saw Mr. Murray, he came and met me just off a piece from the tobacco barn, he was outside of the yard when he met me; when he got to where I was, he said, `Well I have done just what I told you I was going to do,' and he says, `I have played hell, ain't I?' and he said, `Well, I am going to kill myself;' and I says, `No, Buddy, I wouldn't do that, I would go down to Mr. Coursey's and tell him what I had done, and then go on and tell my mother and father;' and I walked off about ten steps down the road with him, and he went in the direction of Mr. Coursey's. . . I had not seen Mr. Murray go to any liquor before the officers got there. After we came from Aline, I went to the place where I saw him outside and looked for liquor and I found some under the doorsteps, it was in a half-gallon jar. . . I did not drink any liquor while I was there and I didn't see him drink any liquor. He told me, if anybody come there he was going to kill them. I was perfectly sober, of course, sure I was. He didn't say where his wife was gone, he said he thought she was down at Mr. Coursey's; he did not say that he had had any trouble there that morning, he told me he went to wash his feet and they all left. The little baby when I went in was lying in its little cradle, it was not asleep, it was not crying at that time. Mrs. McDilda was lying in the bed in the room where we were at; I stayed in there and talked with him eight or ten or twelve minutes before the officers arrived. As to what he and I talked about, he just told me that Sadie Bell run off, and if the officers come, he was going to kill them, that is what he said; he didn't say why he was going to kill them. And directly the officers drove up, and *Page 207 
he said then, "There they is,' I was then standing in the door and I come down the doorsteps; I was standing in the door next to the hall, and he went back in the house, it was something like twelve steps from the doorsteps to the gate. I met the officers at the gate but not on the inside; they were on the outside but I give them time to come in. Mr. Brantley is the first one of the officers who came in and Mr. Jones followed. There wasn't any conversation between me and Mr. Brantley; I just told them, I say, `Boys, watch your step, he has got his gun and that is loaded,' and they never give me no reply; I told Mr. Brantley that and Mr. Jones, `Boys, watch your step, he has got his guns and they are loaded;' they did not stop, they heard me, but they didn't stop at all, they just walked right on. . . The officers were both armed, they had their pistols, and I saw their pistols, I saw the officers' pistols. I have known Mr. Murray ten or fifteen years I guess, I don't remember exactly but something like that. When I went back behind the tobacco barn, I was expecting something to happen, I was expecting the guns to fire because that is what he said he was going to do. I thought he was going to kill the officer if he went in there; I thought that because he told me he was. I say I have been knowing Mr. Murray around fifteen or twenty years. As to whether I would say that Mr. Murray is a moron or whether he is a man of good sense — that morning, he was off bad that morning; I mean by saying that he was off bad that morning, the way he talked and done, he was about crazy that morning; I have never known of him having just such spells as that before since I have been living there by him. I don't remember about a couple of years ago that he went crazy over there and was crazy two weeks and carried to his father's. . . He told me he was going to kill the officers, he was in such condition that morning that he seemed to know right from wrong, and when I came in contact with him after the shooting he said, `I done just like I told you I was going to do,' and he said, `I have played hell, ain't I?'"
W. A. Coursey testified in part: "Mrs. Murray and her two daughters . . came to my house, that is Mrs. Buddy Murray, her name is Sadie Bell . . she had two children by her first husband, two girls, their ages are fourteen and sixteen. . . It was something like 12:30 at night when they came to my house. . . After they got there Mr. Murray came there, they had been *Page 208 
there something like two or three minutes or four minutes before Mrs. Murray came." The testimony of this witness showed: That Mrs. Murray and the girls secreted themselves in some part of the house; that they did not answer to the call of the witness; that the defendant stated he wanted his wife to "come and see about the baby;" that the defendant then said he reckoned he had better go back, and so he and the witness went on to the edge of the porch steps. The witness then said to the defendant, "I trust everything will be all right," to which the defendant replied that he didn't know "whether they would or not." The defendant then left to go home, taking up the double-barrel gun that he had brought with him. "After he went home that night, he did not come back up there any more during the night that I know of, he came back up there the next morning about 8:30 o'clock, I guess. His wife and the two girls left just at first light real early the next morning. He come up there about 8:30 and his wife and the two girls left at first light. I heard the shooting down at the Murray house before Mr. Murray came up there."
The witness further testified that the following morning, after Mrs. Murray and her daughters had left his house, he and his young son were cutting down a tree, and an automobile came to the Murray house, and he saw "two somebodys on the porch" of the Murray house. "After I saw the two men on the porch . . I heard two shots down that way. . . After me and my son had heard the shots fired . . it was after that that Mr. Murray came back to my house, between three and four minutes after I heard those shots fired before he got back there. . . He says, `I have got two of them,' and I didn't know what he meant by saying that, I knew I heard the shots, and I says, `Two of what, Buddy?' and he said, `I have killed the sheriff and Willie Jones . . I have killed them both and they are lying on the porch down yonder.' While he was at my house the night before this occurrence, he had the appearance of being under the influence of intoxicating liquors of some kind. I don't think I smelt the odor of whisky or wine or anything of that sort on him, but the next morning when he was up there he seemed to be drinking, he was able to walk perfectly good and able to talk all right."
Cross-examination: "As to whether or not Mr. Murray is a man of strong mind, well I never did know of him having a weak mind, *Page 209 
his mind is average as much as anyone, I wouldn't say he didn't have average sense. He told me . . at times his heart bothered him and it weakened him and he was disabled almost to talk and it bothered him a good many times in his work or when he was walking. . . I did not swear on direct that he was not drinking. I swore that I did not smell any intoxicants on his breath, I don't know whether I would have smelt it if he had been drinking or not. Me and Rawlings Morgan went to Oak Park after his father and mother, and we brought them back home to my house. I didn't know anything that was the matter with this boy myself then, I just heard of it, I don't know anything at all about it except what I heard."
Hines Brantley testified for the State: "I am the son of T. W. Brantley. I ceased to be sheriff of Candler County on January 1st [1946]. Some time after that, and after Mr. Flint took the oath of office and moved into the jail, Mr. Murray was brought back to the Candler County jail. After he was brought back down there, I went down to the jail and I guess it was around the 10th of January that I went down to the jail, something like that; while I was there I went to Mr. Murray's cell, or the part of it where he was confined; I saw and talked with him; there was no threats or promises made by me to cause him to talk with me; such talking as he did and as I did to him, such talking as he did, was freely and voluntarily done. I will go ahead and tell just what was said between me and Mr. Murray; I went upstairs there, Sheriff Flint went with me, and he called Buddy; he was lying down on a bunk in the cell, and he came to the window and at first apparently he did not realize who I was, but when he saw who I was, he kinda gave a start, and I told him, I says, `Now, Buddy, you are locked up and I am outside and I am not going to abuse you, I haven't come here for that purpose, but I would just like to hear from your own lips exactly how it all took place.' And he said, `Well, Hines, I can't hardly face you;' he says, `I am sorry I killed your daddy.' But he went into details as to when they drove up, and went on and said he was having a lot of trouble with his wife, that he was all mad and worked up and that he was drinking; and he said that he saw my daddy and Willie when they drove up, he started to run, but said it just looked like something pulled him back, and he said instead of running he picked up his gun and stepped out into the hall, and Willie and my daddy walked up the steps on the side next *Page 210 
to Buddy; and he says, `I shot your daddy first and he fell, and I stepped in the door and I shot Mr. Jones;' and he said, `I don't know whether Mr. Jones was on the end of the porch or just off;' and I says, `Well, Buddy, that is about the way it looked to me from the surroundings and from what I have seen out there, that is about the way I had figured it was done;' and I says, `Did my daddy ever pull his gun?' and he said, `No,' he said, `I doubt if he ever saw me until I shot him,' he says, `He might have just as he seen the flash of the gun;' and I says, `Did he talk with you? and he said, `No,' he says, `I did not give him a chance.' Such statements as the defendant made to me were made to me freely and voluntarily, without hope of reward or fear of punishment."
Under his general plea of not guilty, the defendant asserted the defense of insanity, and introduced numerous witnesses for the purpose of establishing such defense. Several of them testified that the defendant's mind would come and go, and they believed that he did not have sufficient mind to know right from wrong. Dr. R. W. Bradford, a psychiatrist, testified that he was sent by Dr. Yarborough, Superintendent of the State Hospital, to examine the accused, and that he did examine him and talked with him at length in jail the day before the trial. He further testified: "My conclusions were that he is not definitely psychotic, and in that I mean that he is not suffering from an acute mental condition at this time, and that he did give a coherent reply on history as to his movements, etc., during the time and just prior to the crime that was committed, and remembered the crime definitely. It was also developed in his history and found that he had but little schooling and his answers to questions were hardly what you would call up to the average, it was not up to the average. I did not do an I. Q. on him and his exact mental level was not attained, but he did impress you that he did not answer questions that should have been answered by a person of normal intelligence. He had had quite a bit of trouble in married life, etc., they had been separated several times and that had given him a good bit of concern, but there was none of that that I could develop that was to the point to say that he was frankly psychotic. As to what type of mental development I would say that the defendant had attained — well, I would say, without doing an I. Q. examination I could not say definitely just the impression that you would get or that you would base it on *Page 211 
without an I. Q. I would say that he would come more on the moron group just above — of course you have them, idiots and imbeciles, then morons, and a moron comes along anywhere from ten or twelve years old on up to just below the normal person, that is the class that I would place him in from my examination. From my examination I think that he is below the normal development of mind. As to whether from my examination I determined or reached any conclusion as to whether or not he was a type that had lucid intervals, or in other words there was times when his mind was better than at others — he impressed me, the information I got from him, his mentality, etc., was about on an even keel; of course a person with that development does not probably have the judgment that a supposedly normal person would have at times. . . As to whether I found the defendant, Alton Murray, to be a person who knows right from wrong, I think he does, yes, sir, I think he does."
The State introduced several witnesses who testified that they were acquainted with the defendant, and that although he had but little education, he appeared to be a person of normal mentality. Dr. L. V. Strickland, a practicing physician and medical director at the State Prison in Tattnall County, testified: "I think he stayed there for about two months. When he came in I made this usual checkup on him. As to what I found as to his mental condition at that time, well, I didn't see anything unusual about his mentality; the record shows that he said that he had been to the third grade, and of course my checkup did not show anything unusual. Where we do find a case that seems to be bordering on psychosis, we call in a psychiatrist, and I did not find enough wrong with him to refer him to the psyocit [sic] board. I found him to be rather illiterate, he did not seem to be so well educated or anything like that, but I did not see anything unusual about him. During the time that he stayed there at the Tattnall Prison I was never at any time called on to treat him for any mental or physical ailment. From my examination of him, I would say that he was a person capable of knowing good from evil or right from wrong. . . From my examination that I did make and the observation of Buddy, he was of average intelligence with other prisoners, I would say that his mind was on an average with other prisoners. On each of the times when I saw Buddy his mind seemed to be about the same *Page 212 
each time. I saw him occasionally before he was taken down to prison, very casually, I think I would have known him but not more than just a casual acquaintance. I don't know anything about the state of his mind during his growing up into young manhood, only just hearsay evidence."
The defendant made no statement to the jury.
The amendment to the motion for a new trial contained seven grounds, numbered 4 to 10 inclusive.
In ground 4, the movant complained because the court sustained an objection of the solicitor-general to the following question propounded by the defendant's attorney to W. A. Coursey on cross-examination: "Do you think a man that would go to your house with his gun perfectly sober you would say looking for his wife, acting like he did there, is a man of good sense?" The objection of the solicitor-general was: "I object to the question, a matter of opinion that he expressed, do you think a man of good sense would do so and so." It is insisted in this ground that, although the witness was not an expert, he should have been permitted to answer the question, since, as insisted, a nonexpert witness could give his opinion as to the sanity of the accused based upon conversations with him.
In ground 5, the movant assigned error upon the following charge to the jury: "In other words, gentlemen, if the defendant had sufficient reason to distinguish between right and wrong he is criminally responsible. The law presumes all persons to be of sound mind and memory, and that the burden is upon the accused to rebut that presumption by a preponderance of the evidence, but not beyond a reasonable doubt." It is insisted that this charge was error, because the defendant had the burden of rebutting the presumption of sanity, not beyond a reasonable doubt, but to the reasonable satisfaction of the jury by a preponderance of the evidence; and that the failure of the judge to use the words, "but to the reasonable satisfaction of the jury," had the effect of confusing the jury, since they would have understood the meaning of the word "satisfaction," but did not without explanation from the court understand the legal meaning of the word "preponderance." It was further contended that the charge as given was erroneous, because the judge failed to explain to the jury what is meant by a preponderance of the evidence. *Page 213 
In ground 6, error was assigned upon the following charge: "Justifiable homicide is the killing of a human being in self-defense or in defense of one's person or habitation against one who manifestly intends or endeavors, by violence or surprise, to commit a felony upon such person." It is contended that this charge was erroneous, because it restricted the right of the defendant to defending his person only, when as a matter of law he had a right to defend his home, habitation, property, or person, and the court therefore should have charged as follows: "Justifiable homicide is the killing of a human being in self-defense or defense of one's habitation, property, or person, against one who manifestly intends by violence or surprise to commit a felony on either."
In ground 7, the movant complained, because the court failed to explain the meaning of justifiable homicide in all its phases, and failed to charge the law of justifiable homicide correctly. This ground then sets out at length the various propositions which the movant contends should have been given in charge to the jury based on the theory that the officers invaded his home without any notice or warning, and relating to justifiable homicide in defense of habitation, property, or person, and to reasonable fear.
In ground 8, the movant complained, because the judge, after being orally requested by counsel for the defendant to do so, failed and declined to charge the jury the provisions of § 26-1013 of the Code, relating to justifiable homicide in defense of habitation.
Ground 9 complained of the failure of the judge to give in charge the law of voluntary manslaughter as contained in the Code, § 26-1007, and other propositions relative to that offense.
Ground 10 complained of the refusal of the judge to exclude the testimony of Hines Brantley, as quoted supra, relating to a confession; the motion to exclude as made by counsel for the defendant, and a colloquy that followed, being as follows:
"I desire to exclude the confession made by the defendant to Mr. Brantley. The criminal law, as your Honor knows, is strictly construed and confessions and admissions in criminal law are received in jail, charged with killing the sheriff of this county at that time. The son of the sheriff was made sheriff and after the unexpired term of his father. Now he tells you from his own lips that when he went to the jail in company with J. H. Flint, the present *Page 214 
sheriff, two sheriffs there, that when this defendant saw Mr. Hines Brantley, he became frightened, that is from the lips of the man that claims the defendant made the confession to, that it scared him. The law says, if Your Honor please, if a confession is made by a defendant charged with crime under any circumstances that would tend to wring it from him, it is inadmissible. If the sheriff frightened him, and he said he did, it is inadmissible. I move to exclude it from the record, it is inadmissible, irrelevant, and incompetent."
Mr. Lanier (the solicitor-general): "I asked him if he made any threats or promises in order to induce him to make this statement, and he said he did not. I asked him if such statements as he made were free and voluntarily, and the witness said, `yes.'"
"The Court: Mr. Brantley, such a statement as the defendant made to you, if he made any to you, were they made to you freely and voluntarily?
"A. Yes, sir.
"Q. Without hope of reward or fear of punishment?
"A. Yes, sir.
"The Court: You may cross him on that, Mr. Kirkland, if you wish.
"Mr. Kirkland: We have no questions.
"The Court: I overrule the motion."
To this ruling the defendant excepted, for the alleged reason that the confession was not made freely and voluntarily; and it was argued in this ground that the witness had used the word "scared" instead of "start," otherwise the solicitor-general would have objected to the use of the word "frighten" as used by the movant's attorney in the motion to exclude.
The testimony of Hines Brantley was set out in full in this ground of the motion, precisely as it appears in the brief of evidence from which it has been quoted supra. It appeared from this ground of the motion that, during the incumbency of the witness, Hines Brantley, as sheriff, after his father's death until January 1, 1946, the defendant was incarcerated elsewhere than in the jail of Candler County.